Evelyn V. Keyes, Justice *369 Appellant, Austin Bridge & Road, LP (Austin Bridge), challenges the trial court's judgment rendered on a jury verdict awarding more than $17 million dollars to appellees Raquel Suarez, Lucila Suarez, Raquel Suarez, and Ruben Dario Suarez, individually and as heirs to and representatives of the Estate of Jose Dario Suarez, deceased (collectively, the Suarezes). In six issues, Austin Bridge argues that: (1) the exclusive-remedy provision of the Texas Workers' Compensation Act (TWCA) bars the Suarezes' negligence claims because Baylor University (Baylor), as the owner of the project on which Jose Suarez was killed, purchased an owner-controlled insurance program (OCIP) that covered all subcontractors and sub-subcontractors, including Austin Bridge and Suarez's employer Derr & Isbell Construction, LLC (Derr & Isbell), and the Suarezes received death benefits under the OCIP workers' compensation policy; (2) the trial court erred in granting the Suarezes' no-evidence summary judgment motion on Austin Bridge's exclusive-remedy defense and in denying Austin Bridge's cross-summary judgment motion, motion for reconsideration, motion for directed verdict, and motion for judgment notwithstanding the verdict on its exclusive-remedy defense; (3) alternatively, the evidence was legally and factually insufficient to support the jury's finding that Austin Bridge exerted actual control over the operative details of the specific injury-producing activity or to support the jury's findings on proximate cause; (4) the evidence was legally and factually insufficient to support the jury's gross negligence and vice principal findings; (5) the evidence was legally and factually insufficient to support the jury's findings regarding Derr & Isbell's proportionate responsibility on the Suarez's negligence; and (6) portions of the jury's damages award were excessive and not supported by the great weight and preponderance of the evidence.
Because we conclude that Austin Bridge established its exclusive-remedy defense as a matter of law and there is no evidence supporting the jury's gross negligence findings, we reverse the trial court's judgment and render judgment that the Suarezes take nothing.
Background
Suarez, an employee of Derr & Isbell, performed steel work for the building of a bridge across the Brazos River in connection with the construction of Baylor University's McLane Stadium (the Project). On January 28, 2014, Suarez was working on a "man-lift" supported on a barge on the Brazos River. He and his coworker Terry Watson-who was operating the man-lift at the time of the accident-were both wearing safety tethers, or "man-ties," connecting them to the lift. The lift fell off the barge into the Brazos River. Watson was able to swim to safety, but Suarez was unable to free himself and drowned.
A. The "Prime" Contract between Baylor and Austin Commercial
The Project involved numerous contractors and multiple contracts. Baylor, as the owner of the worksite (the Owner), purchased an OCIP, which cost it nearly $300,000, and it required all of the contractors and subcontractors to enroll in the OCIP. Baylor executed a contract with Austin Commercial, LP (Baylor/Austin Commercial Contract or the Prime Contract) as the general contractor for the Project (the Construction Manager at Risk *370 or General Contractor) on August 9, 2012.[1] As part of the general conditions of the Prime Contract, Baylor agreed that it
has arranged with Aon Risk Services Southwest, Inc. (the "OCIP Administrator") for the Project to be insured under its Owner Controlled Insurance Program (the "OCIP"). Parties performing labor or services at the Site shall be eligible to enroll in the OCIP as provided below unless they are Excluded Parties (as defined below). The OCIP will provide to Enrolled Parties (as defined below) Workers' Compensation and Employer's Liability insurances, Commercial General Liability insurance, and Excess Liability insurances, as summarily described below, in connection with the performance of the Work (collectively, the "OCIP Coverages").
The OCIP covered "Enrolled Parties," which were defined as including the "Owner, the OCIP Administrator, the Construction Manager at Risk [Austin Commercial] and Subcontractors and Sub-Subcontractors that are granted insured status on the OCIP Policies."
The Prime Contract required Austin Commercial and its Subcontractors to enroll in the OCIP:
Construction Manager at Risk [Austin Commercial] shall apply for enrollment in the OCIP within five (5) days of receipt of a Notice to Proceed, shall maintain enrollment in the OCIP, and shall ensure that its eligible Subcontractors and/or Sub-Subcontractors apply for enrollment in the OCIP, and maintain enrollment in the OCIP, within five (5) days of their receipt of a Notice to Proceed, and prior to the commencement of Work at the Site.
The Contract further provided that Baylor, as Owner, might elect to modify or discontinue the OCIP and that it would then bear the cost of replacement insurance:
[Baylor] may, for any reason, modify the coverage provided by the OCIP Policies, discontinue the OCIP or any part thereof, or request that [Austin Commercial] or any of its Subcontractors or Sub-Subcontractors withdraw from the OCIP upon thirty (30) days written notice. Upon such notice [Austin Commercial] and/or one or more of its Subcontractors or Sub-Subcontractors, as specified by [Baylor] in such notice, shall obtain and thereafter maintain during the performance of the Work, all (or a portion thereof as specified by [Baylor] ) of the OCIP Coverages. The form, content, limits of liability, cost, and the insurer issuing such replacement insurance shall be subject as set forth in Section 5.10 above. The cost of the replacement insurance shall be at [Baylor's] expense, but only to the extent of the applicable Costs of the OCIP Policies.
The Prime Contract also incorporated the OCIP manual, stating that Austin Commercial, the General Contractor, "shall comply with all the requirements set forth in [this contract], the Insurance Manual, and the OCIP Policies and the Builder's Risk Insurance policies." The Contract defined "Insurance Manual" as "the manual of OCIP procedures prepared by the OCIP Administrator [Aon] in connection with the OCIP, copies of which will be provided by the OCIP Administrator to all bidders prior to submission of any bids." The OCIP manual stated, among other things, that participating contractors "shall provide details necessary for OCIP enrollment," including providing *371 all "information requested on the Enrollment Application form," which was to "be completed and submitted to the OCIP Administrator within 5 days of a Notice to Proceed and prior to the commencement of work to obtain coverage under the OCIP." Aon, as the OCIP Administrator, would then "issue to each Enrolled Party a Welcome Letter and an OCIP Certificate of Insurance acknowledging acceptance of the applicant into the OCIP. The Insurance Carrier will issue a separate Workers' Compensation policy to each Enrolled Party."
Finally, the Prime Contract required that Austin Commercial "shall incorporate the terms of this Article 5 [setting out the details for insurance coverage] into all subcontract agreements."
B. Austin Commercial's Subcontract with Appellant Austin Bridge
Austin Commercial then subcontracted with its subsidiary, and the appellant here, Austin Bridge (the Austin Commercial/Austin Bridge Subcontract). The Austin Commercial/Austin Bridge Subcontract was comprised of multiple documents, including: (1) the "Master Subcontract Agreement," dated April 11, 2011, setting out the general provisions governing the relationship between Austin Commercial and Austin Bridge; (2) the "Work Order," also referred to as "Exhibit AA," dated June 24, 2013, which was attached to the Master Subcontract Agreement and set out the specific terms of Austin Bridge's work on the Baylor Project; and (3) multiple other exhibits to the Master Subcontract Agreement that set out specific terms governing the Project.
The Master Subcontract Agreement stated that the project name and location were "[v]arious projects as specially defined in per project work orders, Exhibit AA." It expressly incorporated the Prime Contract: "Each party to this Agreement acknowledges that it is familiar with the terms of the Prime Contract, and agrees that the Prime Contract (including the contract documents incorporated therein) is incorporated herein, in its entirety for all purposes as if copied at length and attached hereto." It also stated, "In the event of a discrepancy between the Prime Contract and this Agreement, this Agreement shall govern."
Exhibit AA, referenced in the Master Subcontract Agreement as setting out the specifications for each project, stated that it covered work on the Baylor Stadium. It also contained a list of exhibits, including an Exhibit C concerning "Insurance Requirements," and it provided that "Exhibits included in the Work Order supersede those issued with the Master Subcontract Agreement [i.e., the Austin Commercial/Austin Bridge Subcontract]." Exhibit C required various types of insurance coverage and specifically stated, "Subcontractor [Austin Bridge] and its sub-subcontractors shall provide, at their own expense, Workers Compensation to cover full liability under the Workers Compensation Laws of the jurisdiction in which the Project is located at the statutory limits required by said laws." Exhibit D to the Austin Commercial/Austin Bridge Subcontract contained "special conditions, inclusions, and exclusions," and it provided a breakdown of the "Subcontract Amount." It stated that Austin Bridge would be paid $9,099,000 for the described work on the Project and included an "OCIP Deduct" of $98,000. The record also indicates that Austin Bridge was provided with a copy of the OCIP Manual as part of this Subcontract.
C. Austin Bridge's Subcontract with Derr & Isbell
Austin Bridge then subcontracted with Derr & Isbell, Suarez's employer, to complete *372 certain portions of the steelwork in constructing the bridge across the Brazos River. Similar to the Austin Commercial/Austin Bridge Subcontract, the contract between the parties (the Austin Bridge/Derr & Isbell Subcontract) was comprised of a Master Subcontract Agreement, dated July 6, 2012, a "Work Order," dated August 8, 2012, and attached Exhibits. The agreement between these two parties incorporated the terms of the Prime Contract, stating, "Each Party to this Agreement acknowledges that it is familiar with the terms of the Prime Contract, and agrees that the Prime Contract (including the contract documents incorporated therein) is incorporated herein in its entirety for all purposes as if copied at length and attached hereto." The Austin Bridge/Derr & Isbell Subcontract also contained a list of exhibits, including Exhibit C.1 regarding "Insurance Requirements" and Exhibit D providing "Special Conditions, Inclusions, and Exclusions." Exhibit C.1 required various types of insurance coverage and specifically stated, "Subcontractor [Derr & Isbell] and its sub-subcontractors shall provide, at their own expense, Workers Compensation to cover full liability under the Workers Compensation Laws of the jurisdiction in which the Project is located at the statutory limits required by said laws."
Exhibit D to the Austin Bridge/Derr & Isbell Contract stated, as "Special Condition AK," that "OCIP enrollment is required. OCIP manual and enrollment forms are attached. Completed forms must be returned at least five days prior to starting work." (Emphasis in original).
D. Contractor and Subcontractors, including Austin Bridge and Derr & Isbell, Enrolled in the OCIP
Austin Commercial enrolled in the Baylor Stadium OCIP. The record contains a letter dated August 8, 2013, from Aon, the OCIP Administrator, to Austin Commercial, the General Contractor, referencing the "Baylor University Stadium (OCIP) [and] WC Policy Renewal: C4737652A 08/09/13-08/09/2014." The letter stated, "In accordance with instructions we received from Baylor University, we have renewed coverage for your firm on the Baylor University Stadium OCIP with ACE American Insurance Company effective 08/09/2013." It also included a certificate of insurance, which showed that Austin Commercial's workers' compensation coverage was effective from August 9, 2013 until August 9, 2014. The record also contains a copy of Austin Commercial's Workers' Compensation and Employers Liability Insurance Policy for the Project, issued by Ace American Insurance Company showing the policy period as August 9, 2013 to August 9, 2014. The policy stated,
The policy does not cover work conducted at or from: ANY LOCATION EXCEPT: BAYLOR UNIVERSITY OCIP: FOOTBALL STADIUM THAT WILL BE SITUATED ALONG THE NORTH BANK OF THE BRAZOS RIVER ON THE CAMPUS OF BAYLOR UNIVERSITY. INTERSTATE 35 FORMS THE WESTERN BOUNDARY OF THE SITE, AND MARTIN LUTHER KING, JR. BOULEVARD FORMS THE NORTH BOUNDARY. THE EASTERN PORTION OF THE SITE IS PARTIALLY OCCUPIED BY A LAGOON THAT IS CONNECTED TO THE RIVER.
The policy also included a "Controlled Insurance Program-Amendatory Endorsement" which stated that "[t]his endorsement applies because the policy is providing workers compensation coverage as part of a Controlled Insurance Program." The policy listed Baylor University as the "Project Sponsor."
*373 Austin Bridge likewise enrolled in the OCIP. The record contains a letter from Aon to Austin Bridge, dated July 19, 2013, stating that it had been "enrolled into the Baylor University Stadium's OCIP for Work performed under contract number L 0035," and another letter dated August 8, 2013, reflecting that its enrollment had been renewed. The record also includes a certificate of liability insurance showing workers' compensation coverage effective August 9, 2013 through August 9, 2014. Finally, the record contains a copy of Austin Bridge's workers' compensation insurance policy, issued by Ace American Insurance Company, showing a policy period of August 9, 2013 to August 9, 2014. This worker's compensation insurance policy contained a "Designated Workplaces Exclusion Endorsement" identical to the one in Austin Commercial's policy, stating that the coverage applied only to work performed at the "Baylor University OCIP" for construction of the football stadium. And, identically to the Austin Commercial policy, it had a "Controlled Insurance Program-Amendatory Endorsement" stating that "[t]his endorsement applies because the policy is providing workers compensation coverage as part of a Controlled Insurance Program" and designating Baylor University as the "Project Sponsor."
Derr & Isbell also enrolled in the OCIP. The record contains a letter dated November 21, 2013, from Aon referencing the "Baylor University Stadium Owner Controlled Insurance Program (OCIP)" and "Enrollment-Notification for Contract Number: L 0035-04 [and] WC Policy Number: C47376658." The letter stated that Derr & Isbell had been "enrolled into the Baylor University Stadium's OCIP for Work performed under contract number L 0035-04." It also informed Derr & Isbell that "Baylor University is responsible for all premium payments," and it asked Derr & Isbell to "[r]eport all claims in accordance with the OCIP Insurance Manual." The letter was accompanied by a certificate of liability insurance showing that workers' compensation coverage was in effect from August 9, 2013, through August 9, 2014.
The record also contains a copy of Derr & Isbell's workers' compensation insurance policy, which is essentially identical to the ones issued to Austin Commercial and Austin Bridge. This policy was issued by Ace American Insurance Company and showed the policy period as being from August 9, 2013, to August 9, 2014. It included the same "Designated Workplaces Exclusion Endorsement" as the other two policies, stating that it covered only work performed as part of the "Baylor University OCIP" in constructing the football stadium, and it included a "Controlled Insurance Program-Amendatory Endorsement" that was identical to the other two policies. That endorsement stated, "This endorsement applies because the policy is providing workers compensation coverage as part of a Controlled Insurance Program." It identified Baylor University as the "Project Sponsor" and stated, "The Project Sponsor will pay all premium[s] when due. The Project Sponsor will pay the premium even if part or all of a workers compensation law is not valid."
E. The Suarezes Applied for and Received Death Benefits Under Derr & Isbell's Insurance Policy Issued under Baylor's OCIP
In January 2015, Suarez's family applied for workers' compensation benefits from Derr & Isbell against the insurance policy issued to Derr & Isbell through the OCIP. The record contains documentation from the Texas Department of Insurance and from a law firm purporting to represent Suarez's family, reflecting that Suarez's widow filed a "Beneficiary Claim for Death *374 Benefits." The record also includes an affidavit and transaction log from a Senior Claims Specialist in Workers' Compensation Claims for the third-party claims administrator reflecting the payments that issued to the Suarezes as a result of their claim. In the affidavit, the claims specialist identified the workers' compensation insurance policy "issued by ACE American Insurance Company to Derr & Isbell Construction, LLC, with a policy period of August 9, 2013, through August 9, 2014," stating that "[t]his policy was in effect at the time of Jose Dario Suarez's death on January 28, 2014."
F. The Suarezes' Lawsuit
The Suarezes filed this suit against Austin Bridge, Derr & Isbell, Austin Commercial, and several other entities not relevant to this appeal. With respect to Austin Bridge, the Suarezes alleged causes of action for negligence and gross negligence. They asserted that Austin Bridge "participated in safety planning, implementation and enforcement for the pedestrian bridge job" and that its actions "constitute[d] negligence which [was] a proximate cause of the incident."
Austin Bridge filed an answer and asserted an "exclusive remedy" affirmative defense, alleging that it was "a member of an Owner Controlled Insurance Program organized under Texas Labor Code 406.123 and as such [is] considered employers of the deceased whose exclusive remedy for negligence is a claim under the Texas Workers Compensation Act, Texas Labor Code 408.001." It subsequently filed a traditional motion for summary judgment based on the TWCA's exclusive-remedy provision, which provides that recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage against his employer, and it argued that because the Project was insured under the Baylor Stadium OCIP, Austin Bridge was deemed a statutory employer of Suarez. Austin Bridge attached copies of the above-described construction contracts and insurance policies. The Suarezes filed a no-evidence motion for summary judgment on the same issue, contending that Austin Bridge had no evidence to support its affirmative defense. The trial court eventually denied Austin Bridge's traditional motion for summary judgment and granted the Suarezes' no-evidence motion, rejecting Austin Bridge's exclusive-remedy affirmative defense pre-trial.
At trial, the Suarezes presented evidence regarding the details of the accident. It also presented evidence regarding the roles of the various contractors, including Austin Commercial, Austin Bridge, and Derr & Isbell, in the work that Suarez was performing at the time he died. The parties presented evidence of various safety standards and the safety practices of the various contractors.
Following the close of the Suarezes' case, Austin Bridge moved for a directed verdict based on the TWCA's exclusive-remedy provision, arguing that it had established its entitlement to that defense as a matter of law, essentially reasserting its arguments from its motion for summary judgment. It introduced into evidence the above-referenced documentation such as the various construction contracts, insurance policies, and details of the payout the Suarezes received from Derr & Isbell under the OCIP policy. The trial court denied this motion, stating, "On the OCIP issues, I've already ruled. I'm not changing my ruling. That motion for directed verdict is denied." Austin Bridge again asserted its exclusive-remedy defense during the jury charge conference and in a motion for judgment notwithstanding the verdict *375 without receiving relief from the trial court.
The jury found that Austin Bridge "exercise[d] some control over the manner in which the pedestrian bridge work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." The jury further found Austin Bridge, but not Derr & Isbell, negligent in Suarez's death, and it determined that Austin Bridge was 100% responsible for Suarez's death. The jury awarded $5 million for Jose Suarez's pain and mental anguish; $7.72 million to his widow for his lost earning capacity, loss of companionship, and mental anguish; and $1 million to each of his children. Finally, the jury found "by clear and convincing evidence that the harm to Jose Suarez resulted from gross negligence" by Bob Beam, the Austin Bridge employee who was supervising the construction of the bridge, and it awarded $2 million in exemplary damages based on its gross negligence finding.
The trial court rendered judgment on the jury verdict and this appeal followed.
Exclusive-Remedy Affirmative Defense
In its first two issues on appeal, Austin Bridge argues that the trial court erred in rejecting its exclusive-remedy affirmative defense when it ruled on the parties' motions for summary judgment and on Austin Bridge's motion for directed verdict, charge objections, and motion for JNOV.
A. Standard of Review
As a preliminary matter, the Suarezes argue that this Court cannot review the trial court's pre-trial order granting their no-evidence motion for summary judgment and denying Austin Bridge's traditional summary judgment motion on its exclusive-remedy affirmative defense. However, "[a] partial summary judgment is reviewable on appeal, where as here, it has been merged into a final judgment disposing of the whole case." DeNucci v. Matthews , 463 S.W.3d 200, 207 (Tex. App.-Austin 2015, no pet.) ; State Farm Fire & Cas. Co. v. Griffin , 888 S.W.2d 150, 153 (Tex. App.-Houston [1st Dist.] 1994, no writ). Furthermore, Austin Bridge reasserted its affirmative defense multiple times, including in a motion for directed verdict and in a motion for JNOV.
Regardless of whether we consider the pretrial motions, the motion for directed verdict, or the JNOV, Austin Bridge must demonstrate that it established its affirmative defense as a matter of law to prevail on this issue on appeal. See Dow Chem. Co. v. Francis , 46 S.W.3d 237, 241 (Tex. 2001) (explaining that "matter of law" legal-sufficiency standard applies when adverse finding is one on which party bore burden of proof).
For example, to prevail on a matter-of-law summary-judgment motion, the movant must establish that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. See TEX. R. CIV. P. 166a(c) ; KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp. , 988 S.W.2d 746, 748 (Tex. 1999). When a defendant moves for a matter-of-law summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. See Cathey v. Booth , 900 S.W.2d 339, 341 (Tex. 1995) ; Centeq Realty, Inc. v. Siegler , 899 S.W.2d 195, 197 (Tex. 1995) ; Lujan v. Navistar Fin. Corp. , 433 S.W.3d 699, 704 (Tex. App.-Houston [1st Dist.] 2014, no pet.). Once the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment.
*376 Siegler , 899 S.W.2d at 197 ; Transcon. Ins. Co. v. Briggs Equip. Trust , 321 S.W.3d 685, 691 (Tex. App.-Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of material fact if reasonable and fair-minded factfinders could differ in their conclusions in light of all of the summary-judgment evidence. See Goodyear Tire & Rubber Co. v. Mayes , 236 S.W.3d 754, 755 (Tex. 2007).
Likewise, when a trial court's denial of a directed verdict is based on the evidence, the standard of review is a legal sufficiency or "no evidence" standard of review. See Flagstar Bank, FSB v. Walker , 451 S.W.3d 490, 498-99 (Tex. App.-Dallas 2014, no pet.). A directed verdict is proper only under limited circumstances, such as when there is no evidence of an essential element of a claim or defense, or when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. See City of Keller v. Wilson , 168 S.W.3d 802, 823 (Tex. 2005) ; King Ranch, Inc. v. Chapman , 118 S.W.3d 742, 750-51 (Tex. 2003) ; Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc. , 29 S.W.3d 74, 77 (Tex. 2000). We use a legal sufficiency standard to review a trial court's denial of a motion for directed verdict. City of Keller , 168 S.W.3d at 823 ; King Ranch , 118 S.W.3d at 750-51. We review the evidence in the light most favorable to the nonmovant. City of Keller , 168 S.W.3d at 824. If "there is any evidence of probative value to raise an issue of material fact on the question presented," the movant is not entitled to a directed verdict. Exxon Corp. v. Emerald Oil & Gas Co., L.C. , 348 S.W.3d 194, 217 (Tex. 2011). On the other hand, to the extent that the trial court's ruling on a directed verdict is based on a question of law, an appellate court reviews that ruling de novo. See JSC Neftegas-Impex v. Citibank, N.A. , 365 S.W.3d 387, 396 (Tex. App.-Houston [1st Dist.] 2011, pet. denied).
A JNOV is proper when a directed verdict would have been proper. See TEX. R. CIV. P. 301 ; Fort Bend Cty. Drainage Dist. v. Sbrusch , 818 S.W.2d 392, 394 (Tex. 1991). And the standard of review for the denial of a motion for JNOV is the same as for the denial of a motion for directed verdict. City of Keller , 168 S.W.3d at 823 ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.").
B. Statutory Framework
The TWCA "provides reciprocal benefits to subscribing employers and their employees." TIC Energy & Chem., Inc. v. Martin , 498 S.W.3d 68, 72 (Tex. 2016). When employers maintain workers' compensation insurance coverage for their employees, the injured employees "are guaranteed prompt payment of their medical bills and lost wages without the time, expense, and uncertainty of proving liability under common-law theories" in exchange for prohibiting them "from seeking common-law remedies from their employers by making workers' compensation benefits an injured employee's exclusive remedy." Id. at 72-73.
Accordingly, the TWCA, set out in the Texas Labor Code, contains an exclusive-remedy provision, which states that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage ... against the employer or an ... employee of the employer for the death of or injury sustained by the employee." TEX. LABOR CODE ANN. § 408.001(a) (West 2015); TIC Energy , 498 S.W.3d at 69. "The exclusive-remedy defense extends to the employer's servants, meaning covered *377 employees secure additional benefits under the [TWCA] in the form of protection from personal-injury claims by co-workers." TIC Energy , 498 S.W.3d at 73 (citing TEX. LABOR CODE ANN. § 408.001(a) ).
Labor Code section 406.123 allows a contractor and subcontractor to enter into a written agreement to provide workers' compensation insurance coverage to the subcontractor and its employees, which permits the general contractor to become a statutory "employer" of the subcontractor and its employees for purposes of applying the exclusive-remedy provision of the TWCA:
(a) A general contractor and a subcontractor may enter into a written agreement under which the general contractor provides workers' compensation insurance coverage to the subcontractor and the employees of the subcontractor.
....
(e) An agreement under this section makes the general contractor the employer of the subcontractor and the subcontractor's employees only for purposes of the workers' compensation laws of this state.
TEX. LABOR CODE ANN. § 406.123 (West 2015).
In HCBeck, Ltd. v. Rice , the Texas Supreme Court held that the owner-controlled insurance program, or OCIP, at issue in that case satisfied the requirements of section 406.123. See 284 S.W.3d 349, 352-55 (Tex. 2009) (analyzing section 406.123 in context of OCIP). Subsequently, in TIC Energy , Texas Supreme Court held regarding OCIPs:
[A] "general contractor who has, pursuant to a written agreement, purchased a workers' compensation insurance policy covering its subcontractors and its subcontractors' employees ... becomes the statutory employer of its subcontractor's employees, and is thus entitled to the benefits conferred on employers by the [TWCA]." Furthermore, because a contractor can " 'provide[ ]' workers' compensation, even when it has not purchased the insurance directly, ... multiple tiers of subcontractors [thereby] qualify as statutory employers entitled to the exclusive-remedy defense." "Such a scheme ... seems consistent with the benefits offered by controlled insurance programs, which are designed to minimize the risk that the subcontractor's employees will be left uncovered." .... [A] construction and application of section 406.123 that "favors blanket coverage to all workers on a site" accords with legislative intent and the "Legislature's 'decided bias' for coverage."
498 S.W.3d at 74 (quoting HCBeck , 284 S.W.3d at 354, 358-59 ). The supreme court concluded in TIC Energy that section 406.123 of the TWCA "provides for an election by which a general contractor may become a statutory employer by agreeing, in writing, to provide workers' compensation insurance to the subcontractor." Id. at 76.
The opinion in TIC Energy relied extensively on the supreme court's prior opinion in HCBeck , in which it held that "the Texas workers' compensation insurance scheme, as enacted by the Legislature, was intended to make the exclusive remedy defense available to a general contractor who, by use of a written agreement with the owner and subcontractors, provides workers' compensation insurance coverage to its subcontractors and the subcontractors' employees." HCBeck , 284 S.W.3d at 360. In HCBeck , an OCIP administered and paid for by the project owner, FMR, provided workers' compensation coverage to all contractors and their employees working at the job site. Id. at 352. HCBeck was the general contractor.
*378 It subcontracted with Haley Greer, which was the employer of Rice, the plaintiff who was injured while working on FMR's project. Id. Rice sought damages from HCBeck, arguing that HCBeck did "not qualify as [his] statutory employer [pursuant to section 406.123 ] because, by the terms of the subcontract between HCBeck [the general contractor] and Haley Greer [the subcontractor], HCBeck was never obligated to provide workers' compensation insurance coverage to Haley Greer or its employees in the event [the owner] FMR opted to terminate the OCIP." Id.
The court pointed out that the contracts at issue permitted the owner FMR "to terminate the OCIP at any time," but that they also required the individual contractors to obtain "alternate insurance." Id. at 353. The court quoted the alternative insurance provision, which provided, in relevant part, "If [FMR] elects to exclude this Agreement, or any portion thereof, from the OCIP or for any reason [FMR] is unable or unwilling to furnish [the OCIP] ... the Construction Manager [HCBeck] shall secure such insurance at [FMR's] cost...." Id. The court concluded that this provision required HCBeck, as the Construction Manager and general contractor, to secure alternate insurance in the event the owner, FMR, discontinued the OCIP. Id. It stated, "When read together, these provisions outline a contingency plan in the event FMR exercises its contractual right to opt out of its obligation to provide workers' compensation insurance coverage, and that plan charges HCBeck with the responsibility of providing alternate insurance, not Haley Greer." Id.
The supreme court concluded that "HCBeck complied in all respects with the provision in the [TWCA] that expressly allows it to enter into a written agreement to provide workers' compensation insurance to its subcontractors and their employees." Id. It stated:
[ Section 406.123 ] does not require a general contractor to actually obtain the insurance, or even pay for it directly. The [TWCA] only requires that there be a written agreement to provide workers' compensation insurance coverage. In this case, the coverage that was actually provided to Haley Greer [a subcontractor] by FMR [the project owner] under the agreement was backed by HCBeck's [the general contractor's] specific obligation assuring that Haley Greer remained covered in the event FMR decided to discontinue its OCIP.
Id. at 353-54 (internal citations omitted).
The court further concluded that the TWCA's exclusive-remedy defense extended to HCBeck:
The OCIP in this case, established and paid for by FMR pursuant to its contract with HCBeck, qualifies under the [TWCA] as "providing" workers' compensation insurance to subcontractors in a manner that is consistent with section 406.123(a). HCBeck, having "provided" the coverage to Haley Greer and its employees by virtue of the OCIP, and having otherwise satisfied the [TWCA's] requirements to qualify as a statutory employer, should be afforded the [TWCA's] employer benefits; i.e. , the exclusive remedy defense against Rice's negligence claims.
Id. at 360.
In TIC Energy , the supreme court subsequently addressed "whether a subcontractor is entitled to the exclusive-remedy defense as a fellow employee of the general contractor's employees by virtue of the general contractor's written agreement to provide workers' compensation insurance to the subcontractor." 498 S.W.3d at 69 (describing issue). In TIC Energy , the worker, Martin, was employed at a plant *379 operated by the general contractor, Union Carbide Corporation. Martin was injured in a workplace accident and recovered workers' compensation benefits through an OCIP administered by Union Carbide's parent company, Dow Chemical Company. Id. at 70. Martin then sued TIC Energy & Chemical, Inc., a subcontractor providing maintenance services at the facility where Martin was injured, alleging that TIC's employees negligently caused his injury. Id.
TIC "claimed the statutory defense as Martin's deemed fellow employee based on section 406.123 of the Labor Code" and "produced evidence of a written agreement with Union Carbide [Martin's employer] that extended workers' compensation insurance coverage under the OCIP to TIC and its employees, with the cost of coverage premiums excluded from TIC's bid." Id. In response, Martin argued that the exclusive-remedy provision did not apply to TIC because it was an independent contractor and Labor Code section 406.122(b) provides that, in such circumstances, a subcontractor like TIC is not an employee of the general contractor. Id. at 70-71 ; see TEX. LABOR CODE ANN. § 406.122(b) (West 2015) (providing that for purposes of workers' compensation insurance coverage, person who performs work for general contractor who is "an employer," as defined in TWCA, is "an employee" of that general contractor unless person is hired or operating as independent contractor).
The Texas Supreme Court observed that "[t]he exclusive-remedy defense extends to the employer's servants, meaning covered employees secure additional benefits under the [TWCA] in the form of protection from personal-injury claims by co-workers." TIC Energy , 498 S.W.3d at 73. The court cited HCBeck and concluded that Martin's employer, Union Carbide, as the general contractor, and TIC, as the subcontractor, "had an agreement complying with section 406.123" and that TIC was engaged as an independent contractor meeting the criteria of section 406.122(b). Id. at 74. The court stated that "[t]he sole matter in dispute is the legal effect sections 406.122(b) and 406.123 have when agreements meeting the terms of both govern the general contractor and subcontractor relationship." Id.
The supreme court concluded in TIC Energy that section 406.122(b) -providing that a subcontractor and its employees are not employees of the general contractor if the subcontractor is operating as an independent contractor-sets out a general rule, and section 406.123-providing that a general contractor's written agreement to provide workers' compensation insurance to a subcontractor and its employees makes the general contractor a statutory employer of the subcontractor and its employees for purposes of workers' compensation laws-provides a permissive exception to the general rule. Id. at 75. It stated, "Taken together, the only plausible reading of the statute is that section 406.122 states a general rule of employment status for workers' compensation purposes and section 406.123 deviates from that rule by creating the fiction of another." Id. at 76. The supreme court expressly rejected Martin's construction of section 406.123 as not permitting lower-tier subcontractors and their employees to assert the exclusive-remedy bar as co-employees of higher-tier contractors and their employees, stating, "If lower-tier subcontractors are not employees, then none of the higher-tier contractors could claim the defense. An interpretation that produces such a consequence is not only contrary to our holding in HCBeck , it is also counter to the Workers' Compensation Act's reciprocal-benefit scheme and defies logic." Id.
*380 In support of its holding extending statutory immunity from negligence damages to subcontractors as fellow employees of higher-tier contractors, the court stated:
While higher-tier contractors may be said to "provide" insurance to lower-tier contractors under section 406.123, as we held in HCBeck , Martin contends the same is not true in reverse. As Martin explains it, coverage provided through TIC to its employees and its subcontractors does not equate to coverage provided from TIC to Union Carbide's employees; in other words, TIC has not "contribut[ed] something of value" to Martin. Martin's argument misses the mark, however, because exclusive-remedy immunity goes both ways. That is, if Union Carbide's employees are co-employees with TIC, Union Carbide's employees enjoy the same statutory immunity that TIC enjoys. Mutual protection from personal-injury claims by those engaged in a common endeavor is valuable and a significant component of the statutory scheme.
Id. at 77-78. The court ultimately held that TIC was entitled to rely on the TWCA's exclusive-remedy defense as Martin's co-employee. Id. at 78.
In its TIC Energy opinion, the supreme court cited this Court's opinion in Etie v. Walsh & Albert Co. , 135 S.W.3d 764 (Tex. App.-Houston [1st Dist.] 2004, pet. denied), which is also on point here. In Etie , this Court held "that the statutory employer/employee relationship [created by section 406.123 ] extends throughout all tiers of subcontractors and that all covered employees are fellow servants who are equally entitled to workers' compensation benefits and equally immune from suit." Id. at 765, 768. We described the contractual and statutory relationships:
Clark Construction [the general contractor] provided workers' compensation coverage to all of the employees who worked at the site as part of its contract with [subcontractor] Way Engineering [which was also Etie's employer]. Way Engineering's contract with Walsh & Albert [a sub-subcontractor] incorporated by reference all of the provisions of the contract between Clark Construction and Way Engineering. Consequently, Walsh & Albert and its employees were also covered by the workers' compensation insurance policy that Clark Construction purchased. Therefore, as a general contractor who provided workers' compensation coverage, Way Engineering became Walsh & Albert's "employer" for purposes of the workers' compensation statute. Walsh & Albert, and its employees, became Way Engineering's "employees" [and thus Etie's co-employees].
Id. at 767 (identifying mid-tier contractor Way Engineering as "a subcontractor" by virtue of its contract with general contractor Clark Construction and also "a general contractor" by virtue of its contract with its own subcontractor Walsh & Albert, as those terms are defined in TWCA). We further observed that "[t]he Texas Supreme Court ... noted that the purposes of the [TWCA] are carried out by recognizing that the definition of 'employer' and 'employee' and the exclusive remedy provision may apply to more than one employer." Id. at 768 (citing Wingfoot Enterprs. v. Alvarado , 111 S.W.3d 134, 142 (Tex. 2003) ).
We concluded that "the purposes of the [TWCA] are best served by deeming immune from suit all subcontractors and lower tier subcontractors who are collectively covered by workers' compensation insurance." Id. We held:
[T]he Act's deemed employer/employee relationship extends throughout all tiers of subcontractors when the general contractor *381 has purchased workers' compensation insurance that covers all of the workers on the site. All such participating employers/subcontractors are thus immune from suit. We further hold that the participating employees are fellow servants, equally entitled to workers' compensation benefits and equally immune from suit.
Id.
Given this statutory framework, we turn now to the particular facts of this case.
C. Austin Bridge Conclusively Established its Exclusive-Remedy Defense
Austin Bridge asserts that it conclusively established that it and Derr & Isbell (Suarez's employer), and indeed the General Contractor, Austin Commercial, and all of the relevant subcontractors of every tier on the Project, had an agreement complying with TWCA section 406.123.
1. Written agreement to provide workers' compensation insurance coverage by setting up an OCIP
Austin Bridge provided copies of the various construction contracts through which Baylor University, as the Owner of the Project, established an OCIP and purchased insurance to cover the entire Project. In the Prime Contract, Baylor agreed to provide the OCIP, and it specifically required Austin Commercial, the General Contractor, to enroll in the OCIP. The Prime Contract incorporated the OCIP Manual and other relevant documents. The Prime Contract also required Austin Commercial to make enrollment in the OCIP a condition in its contracts with any subcontractors and sub-subcontractors. Regarding the OCIP specifically, the Prime Contract further provided that, in the event Baylor modified or discontinued the OCIP, Austin Commercial "and/or one or more of its Subcontractors or Sub-Subcontractors ... shall obtain and thereafter maintain ... the OCIP Coverages." The Prime Contract stated, "The cost of the replacement insurance shall be at [Baylor's] expense, but only to the extent of the applicable Costs of the OCIP Policies."
We must read all of these contractual provisions together in order to ascertain the true intentions of the parties as expressed in the writing itself. Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc. , 473 S.W.3d 296, 305 (Tex. 2015) (holding that courts must "consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless"). We must also construe the Prime Contract "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoid[ ] unreasonable constructions when possible and proper." See ids="6836817" index="60" url="https://cite.case.law/sw3d/473/296/#p305">id. (internal quotations omitted).
Accordingly, we conclude that the Prime Contract constitutes a written agreement between Baylor, as the Project Owner, and Austin Commercial, as the General Contractor, to provide workers' compensation coverage to all of the workers on the Project, including the employees of Austin Commercial; all Subcontractors, including Austin Bridge; and all Sub-subcontractors, including Derr & Isbell. This written agreement to provide workers' compensation coverage to the entire job site through the OCIP is, contrary to the Suarezes' assertions, substantially similar to the one approved by the Texas Supreme Court in HCBeck .
Just as the project owner FMR did in HCBeck , Baylor agreed in writing with the General Contractor, Austin Commercial, to create an OCIP to provide workers' compensation insurance coverage to all workers on the Project, including the employees of all subcontractors and sub-subcontractors. See 284 S.W.3d at 350-51.
*382 Likewise, the Prime Contract permitted Baylor to modify or discontinue the OCIP, and it provided that Baylor would then bear the cost of replacement insurance obtained by its general contractor or its subcontractors:
[Baylor] may, for any reason, modify the coverage provided by the OCIP Policies, discontinue the OCIP or any part thereof, or request that [Austin Commercial] or any of its Subcontractors or Sub-Subcontractors withdraw from the OCIP upon thirty (30) days written notice. Upon such notice [Austin Commercial] and/or one or more of its Subcontractors or Sub-Subcontractors, as specified by [Baylor] in such notice, shall obtain and thereafter maintain during the performance of the Work, all (or a portion thereof as specified by [Baylor] ) of the OCIP Coverages. The form, content, limits of liability, cost, and the insurer issuing such replacement insurance shall be subject as set forth in Section 5.10 above. The cost of the replacement insurance shall be at [Baylor's] expense, but only to the extent of the applicable Costs of the OCIP Policies.
Here, as in HCBeck , the Project Owner Baylor provided insurance through an OCIP, and the contract between Baylor and the General Contractor Austin Commercial provided for alternative coverage-to be obtained by Austin Commercial "and/or one or more of its Subcontractors or Sub-Subcontractors" as "replacement insurance" at Baylor's expense-thereby providing assurance that subcontractors would remain covered in the event Baylor discontinued its OCIP. See ids="7301523" index="62" url="https://cite.case.law/sw3d/284/349/#p352">id. at 353-54.
We conclude, in accordance with HCBeck , that the General Contractor Austin Commercial " 'provide[d]' workers' compensation insurance under the [TWCA] because the insurance plan incorporated into both its upstream contract with [the Project Owner, Baylor] and its downstream contract with [its subcontractors] included workers' compensation coverage to [the subcontractors'] employees, and because the contracts specif[ied] that [the General Contractor was] ultimately responsible for obtaining alternate workers' compensation insurance in the event the [Owner] terminated the OCIP." See id. at 351-52.
To the extent the Suarezes argue that this Prime Contract does not constitute a written agreement to provide workers' compensation insurance, we disagree on the basis of the plain language of the Prime Contract, the plain language of section 406.123, and the guidance provided by the supreme court in HCBeck , as set out above.
2. Subcontracts incorporated the OCIP
The Suarezes argue that the Subcontracts do not constitute written agreements to provide workers' compensation insurance. However, each successive Subcontract between the various tiers of contractors expressly incorporated the terms of the Prime Contract and required the Subcontractors, including Austin Bridge (as a Subcontractor of Austin Commercial) and Derr & Isbell (as a Subcontractor of Austin Bridge and a Sub-subcontractor of Austin Commercial), to participate in the OCIP. The Austin Commercial/Austin Bridge Subcontract and the Austin Bridge/Derr & Isbell Subcontract expressly incorporated the terms of the Prime Contract, and both of those contracts reflected that the Subcontractors were aware of the OCIP and the requirement that they enroll in it.
The Suarezes argue that neither of the Subcontracts could have expressly incorporated the Prime Contract, including the requirement that all Subcontractors and *383 Sub-subcontractors enroll in the OCIP, because the Prime Contract between Baylor and Austin Commercial was executed after the lower-tier contracts. We disagree.
"We 'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." Plains Expl. & Prod. Co. , 473 S.W.3d at 305 (quoting Reilly v. Rangers Mgmt., Inc. , 727 S.W.2d 527, 530 (Tex. 1987) ). The nature of the work described in each of these agreements clearly evidences an intention among the parties that Austin Commercial serve as the General Contractor for the Project, that Austin Bridge perform part of the work as a Subcontractor of Austin Commercial, and that Derr & Isbell perform work as a Subcontractor of Austin Bridge. The Subcontracts necessarily required the parties to be aware of the terms of the Prime Contract and the higher-tier Subcontracts. The Subcontracts at issue were executed at a time[2] when the nature of the Project ultimately engaged in was sufficiently clear to the parties that they had knowledge of the terms of the Prime Contract and assented to those terms. See Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos. , 409 S.W.3d 181, 189 (Tex. App.-Dallas 2013, no pet.) (holding that for terms incorporated by reference to be enforceable, it must be clear that parties to agreement had knowledge of and assented to incorporated terms and that "[w]hen a document is incorporated into another by reference, both instruments must be read and construed together"). And it is undisputed that the parties were in fact performing under those contracts when the accident occurred.
Not only do the Subcontracts expressly incorporate the Prime Contract, including the requirement that Baylor provide the OCIP and that all contractors of any level enroll in the OCIP, but the exhibits to the Subcontracts also incorporate the OCIP.
Both Subcontracts contained an exhibit specifically governing insurance requirements-Exhibit C to the Austin Commercial/Austin Bridge Subcontract and Exhibit C.1 to the Austin Bridge/Derr & Isbell Subcontract. In both Subcontracts, this provision stated, "Subcontractor and its sub-subcontractors shall provide, at their own expense, Workers Compensation to cover full liability under the Workers Compensation Laws of the jurisdiction in which the Project is located at the statutory limits required by said laws."
Exhibit D to the Austin Commercial/Austin Bridge Subcontract contained "special conditions, inclusions, and exclusions," and it reflected the parties' intention that Austin Bridge obtain its workers' compensation insurance for the Project by enrolling in the Baylor Stadium OCIP. That exhibit referenced the OCIP in the breakdown of the "Subcontract Amount" and included a copy of the OCIP Manual. See TIC Energy , 498 S.W.3d at 70 (citing as evidence of applicability of section 406.123 that TIC "produced evidence of a written agreement with [Martin's employer, the general contractor] that extended *384 workers' compensation insurance coverage under the OCIP to TIC and its employees, with the cost of coverage premiums excluded from TIC's bid").
Likewise, the Austin Bridge/Derr & Isbell Subontract included an Exhibit D providing "Special Conditions, Inclusions, and Exclusions," which expressly stated that "OCIP enrollment is required. OCIP manual and enrollment forms are attached. Completed forms must be returned at least five days prior to starting work." (Emphasis in original).
The Suarezes argue that Austin Bridge has waived its right to assert that it is entitled to the exclusive remedy defense on the basis of its "co-employee" relationship to Derr & Isbell and Suarez because it did not specifically plead that it was a "co-employee" of Suarez's. However, Austin Bridge alleged in its live answer that it was "a member of an Owner Controlled Insurance Program organized under Texas Labor Code 406.123 and as such [is] considered [an] employer[ ] of the deceased whose exclusive remedy for negligence is a claim under the Texas Workers Compensation Act, Texas Labor Code 408.001." The Suarezes did not file any special exceptions to this pleading, and, accordingly, we must liberally construe it. See TEX. R. CIV. P. 90, 91 ; Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc. , 29 S.W.3d 74, 81 (Tex. 2000) (absent special exceptions, we construe pleadings liberally in favor of pleader).
We conclude that Austin Bridge's pleading was sufficient to put the Suarezes on notice of its assertion of the exclusive remedy defense pursuant to its relationship to Suarez under the OCIP and Labor Code section 406.123. See First United Pentecostal Church of Beaumont v. Parker , 514 S.W.3d 214, 224-25 (Tex. 2017) (recognizing that Texas follows fair-notice standard for pleading, which requires courts to consider whether opposing party "can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant," or stated another way, "whether the pleadings have provided the opposing party sufficient information to enable that party to prepare a defense or a response"). We also note that the relationship among various tiers of contractors under an OCIP has been referred to by Texas courts, including the Texas Supreme Court, as both "co-employer" and "co-employee" in different contexts. See, e.g. , TIC Energy , 498 S.W.3d at 75 & n.45, 77 ; HCBeck , 284 S.W.3d at 359 ; Etie , 135 S.W.3d at 767.
The Suarezes assert that the Subcontracts at issue do not comport with case law construing section 406.123 because Austin Bridge did not "provide" OCIP coverage to Derr & Isbell-it merely required enrollment in the OCIP. They cite Valadez v. MEMC Pasadena, Inc. , which held that "merely requiring the subcontractor to obtain its own workers' compensation insurance does not constitute 'providing' coverage within the meaning of the statute." No. 01-09-00778-CV, 2011 WL 743099, at *4 (Tex. App.-Houston [1st Dist.] Mar. 3, 2011, no pet.). The Suarezes also rely on the Texas Supreme Court's holding in HCBeck to support their argument that Austin Bridge's conduct here did not constitute "providing" workers' compensation coverage to Derr & Isbell and its employees.
We first observe that this case is distinguishable from Valadez because the Subcontracts here do more than "merely requiring the subcontractor to obtain its own workers' compensation insurance." See ion index="74" url="https://cite.case.law/citations/?q=2011%20WL%20743099">id. Rather, the Austin Bridge/Derr & Isbell Subcontract required Derr & Isbell to enroll in the Baylor Stadium OCIP, which had been established and paid for by Baylor pursuant to the terms of its written *385 agreement with Austin Commercial, the General Contractor. It also incorporated the Prime Contract, which provided that in the event Baylor were to modify or terminate the OCIP, Austin Commercial, as the General Contractor, and "and/or one or more of its Subcontractors or Sub-Subcontractors ... shall obtain and thereafter maintain ... the OCIP Coverages." The Prime Contract stated, "The cost of the replacement insurance shall be at [Baylor's] expense, but only to the extent of the applicable Costs of the OCIP Policies." The Austin Bridge/Derr & Isbell Subcontract, read together with the other provisions of that contract and the incorporated contracts, merely required Derr & Isbell to pick up any additional costs of providing workers' compensation insurance to its own employees in the event of a shortfall between the expenses paid by Baylor and those of the replacement insurance, so that employees would remain covered by the OCIP in all circumstances. See Plains Expl. & Prod. Co. , 473 S.W.3d at 305 (in construing contracts, no single provision taken alone is given controlling effect, but instead we read all provisions together in context of entire agreement, harmonizing and giving effect to all contract provisions so that none will be rendered meaningless).
Texas Supreme Court precedent from both HCBeck and TIC Energy and precedent from this Court in Etie indicate that this was sufficient for Austin Bridge to "provide" workers' compensation insurance to Derr & Isbell and its employees, making Austin Bridge the statutory co-employer or co-employee of Derr & Isbell and its employees.
As the supreme court recognized in HCBeck , the TWCA supports a construction of the term "provide" as including a subcontractor like Austin Bridge that serves as a "conduit" that " 'provides' the workers' compensation [coverage] by connecting the subcontractor to the monied party most able to pay." 284 S.W.3d at 356. In determining that HCBeck had provided workers' compensation insurance to its subcontractor Haley Greer, even though HCBeck had not directly paid for the coverage, the supreme court observed that TWCA section 406.123"does not require a general contractor to actually obtain the insurance, or even pay for it directly. The [TWCA] only requires that there be a written agreement to provide workers' compensation insurance coverage." Id. at 353 (citing TEX. LABOR CODE ANN. § 406.123(a) ). And the HCBeck court recognized that "[f]or almost one hundred years, the [TWCA] has contemplated that subcontractors can be covered by workers' compensation insurance purchased by others." Id. at 356.
In concluding that HCBeck, as the general contractor, provided coverage to the subcontractor Haley Greer, the supreme court held:
The OCIP in this case, established and paid for by FMR [the owner of the building project] pursuant to its contract with HCBeck [the general contractor], qualifies under the [TWCA] as "providing" workers' compensation insurance to subcontractors in a manner that is consistent with section 406.123(a). HCBeck, having "provided" the coverage to Haley Greer [a subcontractor] and its employees by virtue of the OCIP, and having otherwise satisfied the [TWCA's] requirements to qualify as a statutory employer, should be afforded the [TWCA's] employer benefits; i.e. , the exclusive remedy defense against Rice's [a Haley Greer employee] negligence claims.
Id. at 360.
The supreme court held that its broader interpretation of what it means to "provide" workers' compensation insurance under *386 the TWCA best serves the policy objectives of the legislature. Id. at 358-60. By contrast, to read the meaning of "provides" as narrowly as the Suarezes ask us to do would contravene the "object sought to be obtained," i.e., "to ensure coverage of subcontractors and their employees." Id. at 356 ; see also TIC Energy , 498 S.W.3d at 74 (construing section 406.123 to be "consistent with the benefits offered by controlled insurance programs, which are designed to minimize the risk that the subcontractor's employees will be left uncovered" and holding that construing and applying section 406.123 to "favor[ ] blanket coverage to all workers on a site" accords with legislative intent and "Legislature's 'decided bias' for coverage").
We also observe that the Suarezes wrongly argue that the Austin Bridge/Derr & Isbell Subcontract must itself set out the terms analyzed in HCBeck . HCBeck involved a situation where the defendant, HCBeck, was a general contractor, and, thus, that opinion addressed the nature of the contractual relationship between a project owner and a general contractor. 284 S.W.3d at 350-52. The holdings of the supreme court in TIC Energy and this Court in Etie are instructive here, where the defendant Austin Bridge is a subcontractor that entered into another Subcontract with sub-subcontractor Derr & Isbell that expressly incorporated the terms of the Prime Contract.
As we held in Etie , the TWCA's "deemed employer/employee relationship extends throughout all tiers of subcontractors when the general contractor has purchased workers' compensation insurance that covers all of the workers on the site." 135 S.W.3d at 768. "All such participating employers/subcontractors are thus immune from suit" and "the participating employees are fellow servants, equally entitled to workers' compensation benefits and equally immune from suit." Id. Accordingly, once the Prime Contract here between Baylor and Austin Commercial containing a written agreement to provide workers' compensation insurance coverage was executed and expressly incorporated into the lower-tier contracts, the TWCA's deemed employer/employee relationship extended throughout all tiers of Subcontractors in the Project, including Austin Bridge, Derr & Isbell, and their employees. See ids="9242147,9242195" index="86" url="https://cite.case.law/sw3d/135/764/">id.
This conclusion is supported by the Texas Supreme Court's holding in TIC Energy . The Texas Supreme Court recognized that section 406.123 extends the availability of the exclusive-remedy provision to subcontractors and their employees along multiple tiers where an OCIP like the one at issue here is provided for in the parties' contracts. See TIC Energy , 498 S.W.3d at 77-78. It held that, because a contractor can " 'provide[ ]' workers' compensation, even when it has not purchased the insurance directly, ... multiple tiers of subcontractors [thereby] qualify as statutory employers entitled to the exclusive-remedy defense." See id. at 74 (quoting HCBeck , 284 S.W.3d at 359 ). Thus, TIC was "entitled to rely on the Workers' Compensation Act's exclusive-remedy defense as [the injured worker's] co-employee" under an OCIP. Id. at 78.
In reaching this holding, the supreme court stated its agreement with TIC's construction of both section 406.123 and previous case law, maintaining that reading section 406.123 as including subcontractor TIC within the protection of a general contractor's written agreement to provide workers' compensation insurance "results in comprehensive coverage of workers at a single site in pursuit of a common objection and, therefore, extends the Workers' Compensation Act's benefits and protections both vertically and horizontally among multiple tiers of contractors that *387 may be working side-by-side at a job site." Id. at 75. The court cited numerous other cases applying the exclusive-remedy defense to various tiers of contractors. Id. at 75 n.45 (citing HCBeck , 284 S.W.3d at 359, Entergy Gulf States Inc. v. Summers , 282 S.W.3d 433, 436-38 (Tex. 2009), Funes v. Eldridge Elec. Co. , 270 S.W.3d 666, 670-72 (Tex. App.-San Antonio 2008, no pet.), Etie , 135 S.W.3d at 765, 768, and Garza v. Zachry Constr. Corp. , 373 S.W.3d 715, 721 (Tex. App.-San Antonio 2012, pet. denied) ).
Finally, the supreme court in TIC Energy rejected the plaintiff's argument that TIC had not "contribut[ed] something of value" because the higher-tier contractor had "provided" the insurance coverage. 498 S.W.3d at 77-78. It held that TIC was entitled to rely on the TWCA's exclusive-remedy defense as a co-employee of the injured plaintiff, who was employed by TIC's general contractor, observing that "exclusive-remedy immunity goes both ways" and that "[m]utual protection from personal-injury claims by those engaged in a common endeavor is valuable and a significant component of the statutory scheme." Id.
We conclude that the contracts provided by Austin Bridge in support of its exclusive-remedy defense-the Prime Contract and the Subcontracts-constituted a written agreement to provide workers' compensation insurance coverage pursuant to TWCA section 406.123, thereby making Austin Bridge a statutory co-employer or co-employee of Derr & Isbell and its employees, including Suarez. See HCBeck , 284 S.W.3d at 353 ( section 406.123"does not require a general contractor to actually obtain the insurance, or even pay for it directly," but instead "only requires that there be a written agreement to provide workers' compensation insurance coverage"); Etie , 135 S.W.3d at 768 ("We hold that the [TWCA's] deemed employer/employee relationship extends throughout all tiers of subcontractors when the general contractor has purchased workers' compensation insurance that covers all of the workers on the site.").
3. All parties performed under the written agreements, establishing Austin Bridge's right to the exclusive-remedy defense
Because Austin Bridge can be considered a deemed co-employer or co-employee of Derr & Isbell, it is entitled to the benefit of the TWCA's exclusive-remedy defense if the evidence conclusively demonstrated that the parties actually performed under the terms of the contracts. See TEX. LABOR CODE ANN. § 406.123(e) ; id. § 408.001(a) (providing that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage ... against the employer or an ... employee of the employer[.]"); TIC Energy , 498 S.W.3d at 73-74. We conclude that Austin Bridge did conclusively establish its exclusive-remedy defense.
The evidence shows that all relevant contractors actually enrolled in the OCIP. See HCBeck , 284 S.W.3d at 356 (observing that injured worker "was, in fact, insured when he was injured" and that issue of whether general contractor could be deemed his "statutory employer" under section 406.123, and therefore be entitled to exclusive-remedy defense, "should be determined by what actually happened, not what might have happened"). Specifically, the insurance covering Suarez's employer, Derr & Isbell, at the time of the accident-the policy under which the Suarezes obtained death benefits-expressly stated that "the policy is providing workers compensation coverage as part of a Controlled Insurance Program." It identified Baylor University as the "Project Sponsor" and *388 stated, "The Project Sponsor will pay all premium[s] when due. The Project Sponsor will pay the premium even if part or all of a workers compensation law is not valid." Austin Bridge also provided evidence that the Suarezes applied for and obtained death benefits pursuant to this policy.
We conclude that Austin Bridge conclusively established that the Suarezes received death benefits pursuant to the workers' compensation insurance policy provided to Derr & Isbell, Suarez's direct employer, pursuant to written agreements creating and implementing the Baylor Stadium OCIP to provide workers' compensation insurance to all workers on the Project. Accordingly, we sustain Austin Bridge's first and second issues. We render judgment that the Suarezes take nothing on their negligence claims against Austin Bridge. Accordingly, we need not address Austin Bridge's third, fifth, and sixth issues, challenging other bases of the judgment on that claim.
Gross Negligence
As discussed above, the Labor Code provides that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage ... against the employer or an ... employee of the employer[.]" TEX. LABOR CODE ANN. § 408.001(a). This section, however, "does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence." Id. § 408.001(b).
Here, the jury charge asked, "Do you find by clear and convincing evidence that the harm to Jose Suarez resulted from gross negligence by [Bob Beam], attributable to Austin Bridge & Road, L.P.?" The charge defined "clear and convincing evidence" and further instructed that:
"Gross negligence" also means an act or omission by Bob Beam:
1. which when viewed objectively from the standpoint of Bob Beam at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
2. ... Bob Beam ha[d] actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others.
In its fourth issue, Austin Bridge argues that the evidence was legally and factually insufficient to support the jury's gross negligence finding.[3]
A. Facts Relevant to Gross Negligence
On the day of the accident, Suarez and coworker Terry Watson were working on *389 securing large steel beams as part of the pedestrian bridge over the Brazos River leading to the stadium. To do this work, the two men used a man-lift that was placed on a barge in the river. According to Robert Beam, the Austin Bridge employee who was overseeing construction of the bridge, the task that Suarez and Watson were performing had been completed at least three or four times already without incident. No one with Derr & Isbell had expressed to Beam any concern about the work.
Immediately before the accident, Watson moved the lift on the barge, which was "spudded in place" and as stable as solid ground, so that it would be closer to the area where the two men would be working. Suarez worked as his "spotter." Once the man-lift was in position on the barge, Suarez placed "chocks," or large wooden beams, under the man-lift's tires to hold the lift in place. Suarez did not chain the lift in place on the barge. The two men entered the lift's basket and tethered themselves to it with a safety tether or man-tie. Shortly after Watson began operating the lift basket, the man lift somehow went off the edge of the barge and into the river.[4] Watson was able to swim to safety, but Suarez drowned.
Beam testified that he was not at the work site at the time of the accident. He stated that he "was taking the foreman [from another work crew] over to the motel to get him rooms for his crew" and was on his way back to the work site. He stated that he was "[j]ust outside the bridge when [he] got the phone call" about the accident.
At trial, the Suarezes focused on two alleged safety violations that it asserted constituted gross negligence on the part of Bob Beam, and through him, Austin Bridge. First, it addressed the policy regarding when workers were required to "tie-off" with a safety tether. At one point, Austin Bridge's safety policies contained a "no-tie-off" rule for workers operating over water. However, after discussing the policy with other personnel on the Project, Beam decided to quit enforcing the no-tie-off over water policy. The evidence indicated that the safety plan for the entire job, including Austin Bridge and other contractors, required "a hundred percent tie off," meaning that workers were to be tethered all the time, even over water.
Beam testified at trial that the hundred percent tie-off rule was to comply with regulations of the Occupational Safety and Health Administration of the United States Department of Labor (OSHA). Derr & Isbell's own policy was, likewise, "a hundred percent tie-off." Watson testified that he was taught in an OSHA course on fall protection that workers should be tied off one hundred percent of the time when the fall would be greater than six feet, and that, as far as he was aware, that rule had not changed.
An expert on safety and risk management, Dean Bernal, testified on behalf of Austin Bridge regarding OSHA requirements:
Q. And what did OSHA say about the hypothetical situation where a man was working with the man lift basket over water about tying off?
*390 A. The interpretation letter [from OSHA] says that if you're working over water, that you do not have to be tied off. But when you're working over water and get associated with a structure or coming back to-a lot of time on a barge or land, it gets confusing to employees to tie off, not tie off, when am I on water, when am I on land or over a structure and so forth.
....
[The letter from OSHA interpreting the regulation regarding tying off] says that ... if you unfasten your harness ... or lanyard ... from the aerial lift, you will be cited by the government. It would be a de minimis citation.
Q. And what does that mean?
A. That means that there is a hazard involved, but the government is not going to identify exactly that it is a specific hazard because there are four other citation levels, and de minimis would be the least, the very lowest.
Q. So it's still a violation of Federal regulation. It's just not going to be punished?
A. Correct. It's still a violation of a Federal code of regulations.
The Suarezes also argued that Beam and Austin Bridge were grossly negligent in not requiring Derr & Isbell employees to chain the man-lift to the barge while the lift was in use. Watson testified at trial that Suarez placed the chocks to hold the lift in place. He testified that he did not see a chain, that he had "never seen [the lift] chained down," but, if he had seen chains being used, he "would have known to chain it down." He testified that he would have used the chain if one had been present, and he testified that "[i]f there would have been a chain on [the lift], it wouldn't have went off the barge."
Watson testified about the chock blocks. He stated that, in his safety trainings, "we always put scotch blocks [i.e., chock blocks] up and had a spotter when we're close to the edge." He stated that the blocks were made of wood, were approximately six inches by six inches, and two to three feet long. He testified that he had used lifts near drop-offs on dry land "quite a bit" and had never seen a lift chained. Watson had never heard of a man-lift tipping over a drop-off. Watson further testified that he used the same precautions he usually used over his thirty-two years of experience, including working near drop-offs, on the day of the accident. He used chock blocks, a signal man or "spotter," and maintained a safe distance from the edge.
David Nelson, another Derr & Isbell employee, also testified that the lifts were usually secured with chains when they were transported by boat, but that they were typically only chocked while in use on the barges. He examined photographs of the barges from the day of the accident and observed that there was in fact a chain present on the barge:
Q. Mr. Watson testified to this jury that had he seen [the chain], he would have used it. Had you seen it, would you have told him to use it?
A. No, sir.
Q. There's no reason not to, is there?
A. We chock the wheels, and that was our practice.
Q. You mean you never saw a man lift out there [chained]?
A. During transport, when we transport out there with a boat.
Q. You never saw it out there when it was being used and chained?
A. I don't recall seeing it-well, I'm sure we did. But if we had to move it, we would undo the chains.
*391 Q. Well, in fact, the man lift on the barge right next to [the lift that went off the edge of the barge] was chained.
A. Okay.
Q. And was being used.
A. Right.
Nelson later explained that one of the lifts was chained because it had not been moved after transport. He testified that it was "standard practice on the barge" that the lifts did not have to be secured by a chain.
Chris Leahy, a project manager at Austin Bridge, testified that, prior to Suarez's accident, Austin Bridge's safety policy required that man-lifts be secured in place with either chocks or chains. Beam likewise testified that the policy in place at the time of accident stated that a lift could be secured by chock or by chain, and that either one was acceptable. Beam further testified that, before the accident, Austin Bridge had a verbal instruction from the area manager to chain the lifts down and that "we always chain them down."[5] He acknowledged that the written policy did not require both chocking and chaining, but he testified that he did both. However, Beam also testified that he himself drove a man-lift on a barge to position it for completing various tasks, and he testified that he had directed other workers regarding where to position the man-lifts on the barges on other occasions. He also observed others driving a lift while it was on a barge-which necessarily meant that the lifts were not chained-and Beam had observed someone move a lift as close as one foot from the edge of a barge.
B. Standard of Review & Relevant Law
"In a legal-sufficiency review, we determine whether more than a scintilla of evidence supports the jury's finding by considering evidence favorable to the finding if a reasonable fact-finder could and disregarding evidence contrary to the finding unless a reasonable fact-finder could not." Horizon Health Corp. v. Acadia Healthcare Co. , 520 S.W.3d 848, 859 (Tex. 2017). The evidence supporting a jury's finding is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the rules of law or of evidence bar a court from giving weight to the only evidence presented to prove a vital fact; (3) there is no more than a mere scintilla of evidence presented to prove a vital fact; or (4) the evidence offered conclusively establishes the opposite of a vital fact. Id. ; Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 713 (Tex. 2016) (citing City of Keller , 168 S.W.3d at 810 ). We review "only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary, except contrary evidence that is conclusive." Horizon Health Corp. , 520 S.W.3d at 859 (internal quotations omitted); Sw. Energy Prod. Co. , 491 S.W.3d at 713 (quoting Mancorp, Inc. v. Culpepper , 802 S.W.2d 226, 227 (Tex. 1990), and citing City of Keller , 168 S.W.3d at 817 ).
When a party attacks the factual sufficiency of the evidence supporting a jury finding for which it did not have the burden of proof, the party must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Cain v. Bain , 709 S.W.2d 175, 176 (Tex. 1986) ; Brown & Brown of Tex., Inc. v. Omni Metals, Inc. , 317 S.W.3d 361, 376 (Tex. App.-Houston [1st Dist.] 2010, pet. denied) (op. on reh'g). In conducting a *392 factual-sufficiency review, we must examine, consider, and weigh all of the evidence that supports or contradicts the jury's finding. Francis , 46 S.W.3d at 242 ; Plas-Tex, Inc. v. U.S. Steel Corp. , 772 S.W.2d 442, 445 (Tex. 1989). In doing so, we note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. See Golden Eagle Archery, Inc. v. Jackson , 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. McGalliard v. Kuhlmann , 722 S.W.2d 694, 697 (Tex. 1986).
Gross negligence consists of both objective and subjective elements. U-Haul Int'l, Inc. v. Waldrip , 380 S.W.3d 118, 137 (Tex. 2012). A plaintiff must prove by clear and convincing evidence that: (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Id. ; see TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West Supp. 2017). Under the objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. U-Haul , 380 S.W.3d at 137. Under the subjective element, actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care. Boerjan v. Rodriguez , 436 S.W.3d 307, 311 (Tex. 2014) (per curiam). However, awareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur or the identity of the person who would be injured. See U-Haul , 380 S.W.3d at 139.
"Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Id. at 137 ; see TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2). In reviewing the legal sufficiency of a finding that was required to be proved by clear and convincing evidence, we view the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. See Sw. Bell Tel. Co. v. Garza , 164 S.W.3d 607, 627 (Tex. 2004).
C. Analysis
To prevail on their gross negligence claim, the Suarezes were required to prove that Beam's conduct in failing to enforce Austin Bridge's rule not to tie-off when working over water and in failing to require Derr & Isbell employees to chain the man-lifts when they were being used (1) posed an extreme degree of risk and (2) that Beam had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. See U-Haul , 380 S.W.3d at 137 ; Gen. Motors Corp. v. Sanchez , 997 S.W.2d 584, 595 (Tex. 1999). Austin Bridge argues that when viewed objectively, Beam's conduct did not involve an extreme degree of risk to Suarez and that there was no evidence that Beam subjectively knew about any risk that he disregarded.
Regarding the Suarezes' evidence that Beam was grossly negligent in failing to enforce Austin Bridge's rule not to tie-off when working over water, the evidence *393 demonstrated that numerous safety policies, including OSHA policies, required that workers tie-off one hundred percent of the time that they are working in a setting where the fall would be greater than six feet. Beam's actions in bringing Austin Bridge's enforcement of the tie-off policy into conformity with OSHA standards cannot constitute an "extreme degree of risk," nor can it demonstrate that he acted with conscious disregard of risk. Accordingly, this ground cannot support the jury's gross negligence finding. See U-Haul , 380 S.W.3d at 137. Indeed, the evidence indicated that the one-hundred percent tie-off policy was designed to prevent serious injury. There was no evidence that either Beam or any other person on the Project considered the possibility that someone would be harmed by using a safety tether in accordance with OSHA guidelines. See ids="7115482" index="127" url="https://cite.case.law/sw3d/380/118/#p137">id. ; see also Boerjan , 436 S.W.3d at 311 ("Under the first, objective element, an extreme risk is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.") (internal quotations omitted).
We likewise conclude that the Suarezes' evidence that Beam failed to enforce the verbal directive from the area manager that the man-lifts be chained down while in use is insufficient to support the jury's gross negligence finding. Viewed in the light most favorable to the jury's finding, the evidence indicated that Beam was aware that the written policy of Austin Bridge was that the lifts can be chocked or chained, not both, and he was aware of a verbal directive to keep them chained. He testified that his general practice was to keep them chained, but he himself and other workers would move the lifts around on the barges on occasion, which required that they be unchained. This evidence does not demonstrate that failing to chain the man-lifts posed an extreme risk of harm.
Furthermore, there was no evidence that Beam had actual, subjective awareness of the risk involved on the day of Suarez's accident and that he nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Beam was not present when Suarez's accident occurred and did not observe Watson's moving of the lift or Suarez's efforts in securing the lift in place with the chocks. There was no evidence that any worker had experienced any problems with the safety policy as practiced on the barge-i.e., either chocking or chaining. There was no evidence that any similar accidents or mishaps had occurred during the Project. There was no evidence that Beam knew about the peril to Suarez or someone similarly situated, and there is no evidence of any acts or omissions on Beam's part indicating that he did not care about any risk to Suarez. See Boerjan , 436 S.W.3d at 311 ("Under the subjective element, actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care.") (internal quotations omitted).
We conclude that there was no evidence supporting the jury's finding "that the harm to Jose Suarez resulted from gross negligence by [Bob Beam]." See Horizon Health Corp. , 520 S.W.3d at 859. Accordingly, the Suarezes are not entitled to the exemplary damages awarded based on the finding of gross negligence.
We sustain Austin Bridge's fourth issue.
Conclusion
We reverse the judgment of the trial court and render judgment that the Suarezes take nothing by their claims.

The record demonstrates that the Prime Contract was the "final" agreement between Baylor and Austin Commercial. Preliminary versions of the contract had been exchanged between the parties prior to the final execution on August 9, 2012.

The "final" version of the Prime Contract was executed August 9, 2012. The Work Order that was in effect as part of the Austin Commercial/Austin Bridge Subcontract at the time of the accident was dated June 24, 2013, clearly subsequent to the execution of the Prime Contract. The Work Order that was in effect as part of the Austin Bridge/Derr & Isbell Subcontract at the time of the accident was dated August 8, 2012, and, thus, was likewise created at a time when the scope of the work and terms contained in the Prime Contract were substantially definite enough to be incorporated into subcontracting agreements.

As part of its fourth issue, Austin Bridge also argues that the evidence was legally and factually insufficient to support the jury's finding that Beam was a vice principal of Austin Bridge whose gross negligence could be imputed to Austin Bridge. The charge also instructed that Austin Bridge:
may be grossly negligent because of an act of ... Bob Beam if, but only if-
1. [Austin Bridge] authorized the doing and the manner of the act, or
2. [Beam] was unfit and [Austin Bridge] was reckless in employing him, or
3. [Beam] was employed as a vice-principal or in a managerial capacity and was acting in the scope of employment, or
4. [Austin Bridge] or a vice-principal or other manager of [Austin Bridge] ratified or approved the act.
The charge also defined "vice-principal" and "[a] person [who] is a manager or is employed in a managerial capacity." Because we conclude that there was no evidence to support the jury's finding that Beam was grossly negligent, we need not address this portion of Austin Bridge's fourth issue.

The question of what caused the lift to go over the edge of the barge was sharply contested at trial. Watson testified that he was extending or "booming out" the lift basket and the next thing he knew, he was in the water. Austin Bridge adduced some evidence indicating that Watson might have accidentally engaged the control to move the lift itself, rather than extend the basket, but Watson testified that he was certain he had not used the wrong control.

Similarly, an employee of Austin Commercial, David Smith, testified that he knew it was Austin Bridge's "practice" to chain the lifts to the barges.