**Opinion issued August 13, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-22-00613-CV**

_____

**ROC-HOUSTON, P.A. D/B/A RECONSTRUCTIVE ORTHOPEDIC CENTER OF HOUSTON AND ROC ASC, LLP, Appellant**

**V.**

**DUSHI PARAMESWARAN, M.D., Appellee**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-46008**

---

## MEMORANDUM OPINION

This is an appeal from a breach of contract case that concerns two separate contracts—one, an employment agreement, and the other, a loan agreement. Dr. Dushi Parameswaran sued his former employer, ROC-Houston, P.A., d/b/a Reconstructive Orthopedic Center of Houston ("ROC-Houston" or the "P.A."), for

breach of the employment contract alleging that he was entitled to unpaid compensation. He also sued ROC ASC, LLP ("ASC"), alleging that he was entitled to payment in accordance with the loan agreement.

A jury found that the P.A. breached the employment agreement. The trial court rendered judgment in favor of Parameswaran after applying an offset found by the jury. The trial court's judgment ordered that Parameswaran recover $299,031.38 plus prejudgment interest and attorney's fees of $231,391.50 from the P.A. The jury also found that ASC breached the loan agreement. The trial court entered judgment on the verdict, ordering that Parameswaran recover $110,025.91 plus prejudgment interest and attorney's fees of $77,130.50 from ASC. The trial court's judgment also awarded contingent appellate attorney's fees.

On appeal, the P.A. argues that the employment agreement is unambiguous and that the court should render a take-nothing judgment against Parameswaran as a matter of law. It also seeks remand for calculation and assessment of attorney's fees. ASC argues on appeal that the loan agreement is unambiguous and that the court should render a take-nothing judgment against Parameswaran as a matter of law.

We conclude that both contracts are unambiguous, and that the jury's verdict as to the loan agreement is consonant with the unambiguous meaning of the contract. We reverse the judgment in favor of Parameswaran on the employment

2

agreement, render judgment that Parameswaran take nothing on his claim, and remand to the trial court for assessment of attorney's fees. We affirm the judgment in favor of Parameswaran on the loan agreement.

## Background

### I. Dr. Parameswaran joins the P.A.

Dr. Marcos Masson, an orthopedic surgeon, founded and owned both the P.A. and ASC. The P.A. operated a clinic and a physical therapy facility, while ASC operated an ambulatory surgical center where physicians employed by the P.A. performed most of their surgeries. In August 2010, after becoming an orthopedic surgeon, Parameswaran went to work for the P.A.

### II. The parties sign an employment agreement.

Before he began work, Parameswaran and the P.A. signed a contract, the "Physician Employment Agreement." The initial term of employment was two years beginning no later than August 23, 2010, with automatic renewal for additional one-year terms. The employment agreement contemplated that Parameswaran could become a shareholder of the P.A. after the initial term. The employment agreement stated that it "shall not be modified or amended except by a written document executed by both Parties to this Agreement, and such written modification(s) shall be attached to this Agreement."

3

Part VII of the employment agreement was entitled, "Opportunity to Become Shareholder," and it provided that Parameswaran would have "the opportunity to be considered for admission as a shareholder of [the P.A.] with an ownership interest in [the P.A.] *equal to the ownership interest of the other Shareholders*." (Emphasis added). The employment agreement required a newly admitted shareholder to purchase an ownership interest, and it entitled him "to share in the revenues from the medical clinic, physical therapy services and diagnostics services provided by the [P.A.]." The employment agreement also contemplated that a newly admitted shareholder would have an option, but not an obligation, to purchase an ownership interest in ASC.

The employment agreement defined compensation by reference to an attached document, Attachment A, which described the following types of compensation and benefits: base compensation, employment-related benefits, expenses, insurance, and vacation. Attachment A did not mention bonuses, and it included the following provision for base compensation:

1. Base Compensation. Physician shall receive annual base compensation totaling $409,076 and $204,538 over the next six months, for a total of $613,614 over an 18-month period, payable by Association, in cash in equal biweekly installments (i.e., 26 payments per year) on every other Friday following the Commencement Date, subject to withholding as authorized by law. After the first 18 months, Physician shall be compensated in accordance with the Association's standard compensation model. Physician shall receive monthly the difference between his collections and his pro-rata share of expenses. Expenses shall be divided evenly between each of the physicians in the Association.

As to the purchase price for buying in to the practice, Attachment A stated:

7. Purchase Price for Buy-In. If Physician enters into an agreement to become a Shareholder in the [P.A.], the difference between Physician's collected revenues and his pro-rata share of expenses (calculated as if he were an equal Shareholder) for the Term minus Physician's base compensation for the Term shall be deducted from the purchase price at the time of his admission into the Association.

## III. The P.A. uses several methods to determine how much to pay Parameswaran.

At trial, Parameswaran testified that he was paid a salary in accordance with the employment agreement for the first 18 months that he worked for the P.A. Thereafter, for the next 10 months, he was paid a lower salary which he claims was not in accordance with the employment agreement. Beginning in January 2013, he began receiving payment that resembled the "standard compensation model" but he testified there were some differences. In 2023, Parameswaran also began receiving semi-annual reports showing collections and expenses that had been

5

attributed to him from each part of the practice. Parameswaran testified that he received an additional payment along with each semiannual report.

Parameswaran explained, based on multiple reports admitted as exhibits at trial, how he believed the expenses were divided "evenly" among the doctors. He said that in 2013 and 2014, expenses were calculated by multiplying the P.A.'s total expenses by the individual doctor's percentage of collections. Thus, doctors whose collections were lower, like Parameswaran, were assessed both a smaller percentage of the total expenses and a smaller amount of expenses. In 2015, expenses were calculated by comparing total collections to total expenses for the P.A. to arrive at an "overhead factor" that represented expenses as a percentage of collections. He testified that each doctor's "pro rata" portion of the expenses was calculated by multiplying his individually attributed collections by the factor. Under this formula, doctors with lower collections paid a smaller amount of expenses, but all doctors paid the same percentage of their collections as expenses. Parameswaran also testified that in mid-2015, he spoke to Masson about what he considered to be escalating expenses, and, according to Parameswaran, Masson promised to cap expenses at 65% of a doctor's collections going forward. In 2015 or 2016, Masson distributed a handbook to the doctors that described policies and procedures for various aspects of the practice, and it included the following

statement in the "Compensation" paragraph: "The overhead is a function of expenses and income and is capped at 65%."

According to Parameswaran and documents admitted at trial, during some time periods, facility fees collected by ASC for surgeries performed at the ASC facility were added to the doctors' individual collection totals. Regardless of which method was used to divide expenses—percentage of collections, overhead factor, or 65% cap—after subtracting expenses from collections, the net amount of each doctor's collections was further reduced by the amount of salary he was paid during the same time period to result in the additional payment. Parameswaran considered these additional payments to be "base compensation" owed under the employment agreement, but Masson testified that these payments were purely discretionary bonuses that he provided to incentivize the doctors to grow the practice. Despite the several different methods used to determine compensation, it is undisputed that the parties never modified the employment agreement by a written document executed by both parties and attached to the original agreement.

In addition to the money that Parameswaran earned from the P.A., Parameswaran also earned money from a chiropractic group that regularly referred patients to the practice and from an MRI facility. He began these activities on a limited basis in 2012 or 2013. Parameswaran testified that he considered this self-employment. He acknowledged that outside employment was prohibited by the

7

employment agreement except with written permission and unless the payments were transferred to the P.A. Parameswaran did not transfer the payments to the P.A., and he did not have written permission to engage in the outside work. Parameswaran testified that he had spoken to Masson, who orally agreed to the arrangement, but Masson testified that he first learned about Parameswaran's outside work during the litigation.

## IV. The P.A.'s doctors loan ASC money to purchase real estate.

In the summer of 2014, Masson proposed to Parameswaran, and the two other doctors who worked for the P.A., Dr. Levaro and Dr. Shuhatovich, that they purchase land in Baytown, Texas to build a new clinic, therapy facility, and surgery center. Masson believed that there was a market for treating injured industrial workers in the area.

The four doctors agreed to loan ASC money for the real property purchase. They signed a loan agreement that defined Masson, Levaro, Parameswaran, and Shuhatovich as lenders, and ASC as the borrower. The agreement established that ASC had obtained a promissory note from Prosperity Bank for $937,5000. The loan from the doctors, for the downpayment, was to be in the aggregate amount of $322,489, which amounted to $80,622.25 from each lender. Although the loan agreement specified that each doctor would extend a term loan of $80,622.25, the loan agreement stated that each doctor agreed to pay 25% of the monthly amount

8

of principal and interest due on the Prosperity Bank Note, beginning at closing and monthly thereafter until the maturity date of the bank note.

The Loan Agreement required ASC to repay the loans from the doctors under the following circumstances:

> Section 3.4. Repayment of Principal and Interest. The principal of and interest on the Term Loans (and, therefore the Term Notes) shall be due and payable by Borrower [ASC] as follows:
>
> (a) Upon any Lender becoming a Terminated Lender, Borrower shall pay to such a Terminated Lender, the greater of (i) twenty-five percent (25%) multiplied by the Appraised Value of the Real Property (provided, however, that if the accretion in value of the Real Property is determined to be interest then such payment due to the accretion in value shall be limited to the Maximum Rate), or (ii) the sum of the outstanding principal amount of, plus accrued interest on, such Terminated Lender's Term Loan; or
>
> (b) Upon the sale of the Real Property, Borrower shall pay to any Lender who is not a Terminated Lender, the greater of (i) twenty-five percent (25%) multiplied by the Net Sales Price (provided, however, that if the accretion in value of the Real Property is determined to be interest then such payment due to the accretion in value shall be limited to the Maximum Rate), or (ii) the sum of the outstanding principal amount of, plus accrued interest on, such Lender's Term Loan.

The loan agreement defined "Terminated Lender" as "any Lender that is no longer employed in any capacity by Borrower." It is undisputed that both before and after the loan agreement was signed Parameswaran, Levaro, and Shuhatovich were employees of the P.A., and they did not receive paychecks from ASC.

## V.     Parameswaran resigns amid a dispute about compensation.

Parameswaran testified that he typically received a check from the P.A. around the same time that he received a report showing collections and expenses. He said that he did not receive either a report or a check for the second half of 2015. When he inquired about this in early 2016, he was told that the P.A. was saving money for taxes or paying down debt, and the payments would be made later. Parameswaran also said that he did not receive a check or a report for 2016 until June 2017. He further testified that, at a meeting of the P.A.'s doctors in January 2017, Masson acknowledged that he was behind in paying the doctors.

Parameswaran testified that he received a report with the accounting information pertaining to all of 2017 in early 2018. He said that was when he first learned that the P.A. had applied a 75% overhead factor for all of 2017, rather than the 65% to which Masson had agreed. He informed Masson that he was resigning, and his last day working for the P.A. was March 2, 2018. When he left, the balance on the Prosperity Bank loan was $756,296.35. According to Masson, Parameswaran was responsible for $189,074.09 of the remaining loan balance. Parameswaran testified that he believed that, as of his resignation, he was a "terminated lender" under the loan agreement. It is undisputed that following his resignation, Parameswaran made no further payments on his portion of the Prosperity Bank loan.

## VI.    Parameswaran files suit and prevails at trial.

Parameswaran sued the P.A. and ASC for breach of contract.[1] He alleged that the P.A. had breached the employment agreement by not paying his compensation in accordance with the contract terms. He alleged that ASC had breached the loan agreement by not paying him 25% of the value of the real property when he became a terminated lender. ASC counterclaimed for breach of the loan agreement, arguing that Parameswaran had failed to make the monthly payments of one-fourth of what was owed on the Prosperity Bank loan. The P.A. argued that if Parameswaran prevailed on his claim for breach of the employment agreement, any damages found by the jury should be offset by any overpayments made by the P.A. to Parameswaran.

In March 2021, the P.A. and ASC filed a third amended answer. The P.A. again pleaded the offset defense, but it added that any damages found in Parameswaran's favor should be offset by any money he earned "by moonlighting during his employment in violation of . . . his Employment Agreement." Parameswaran moved to strike the third amended answer arguing that it was prejudicial because it was filed after the defendant-appellants had obtained a preferential trial setting and within 60 days of trial. Parameswaran also argued that he had objected to a prior discovery request seeking information about money he

---

[1]    Parameswaran also sued Masson, but those claims were dismissed on summary judgment and are not part of this appeal.

11

earned working outside the P.A. while also employed by the P.A. He asserted that the third amended petition was a belated attempt to support the P.A.'s motion to compel discovery. The P.A. responded that its new defenses were neither surprising nor prejudicial, but the trial court granted the motion to strike, striking the P.A.'s defense of prior material breach (by moonlighting) and ASC's defense of lack of consideration.

The trial court found that the loan agreement was ambiguous regarding whether Parameswaran was considered a "terminated lender" under the loan agreement. That question of fact was submitted to the jury. The parties argued to the court multiple times that the employment agreement was unambiguous, despite their advocacy for greatly differing interpretations of the contract. Their main disagreement was in the construction of the compensation provision. The trial court did not make any rulings as to the ambiguity of the compensation provision before trial.

During trial, the court admitted evidence of both parties' constructions of the compensation provision, primarily in the form of competing damages models. Parameswaran's damages model included collections from both the ASC and the P.A., and it applied an overhead factor. This model relied on data that was compiled twice per year. The P.A.'s model relied on a month-by-month calculation

of Parameswaran's collections, reduced by one-fourth of the P.A.'s expenses. This model did not include collections from ASC or any overhead factor.

The jury found that the P.A. failed to comply with the employment agreement, and it found the following sums of money would compensate Parameswaran for the breach: (1) $160,960.42 for 2015; (2) $182,667.55 for 2016; and (3) $79,218.41 for 2017. The jury also found that Parameswaran earned $123,815.00 from practicing medicine outside of the P.A. while he was employed by the P.A.

As to the loan agreement, the jury answered "yes" to the question, "Did the parties mutually intend that Parameswaran was employed in any capacity by ROC ASC, L.L.P. at the time of the [loan] Agreement?" The jury found that ASC failed to comply with the loan agreement, but Parameswaran did not. The jury found that $110,925.91 would compensate Parameswaran for his damages. This amount represented the difference between one-fourth of value of the Baytown real estate on March 2, 2018, as valued by the P.A.'s testifying expert, and one-fourth of the remaining balance on the Prosperity Bank note on the same day:

$\frac{1}{4}$ ($1,200,000) – $\frac{1}{4}$ ($756,296.35) = $300,000 - $189,074.09 = $110,925.91.

After trial, Parameswaran filed a motion to disregard the jury's reduction of the value of the real estate, urging the court to award $300,000 rather than $110,925.91 for breach of the loan agreement. After a hearing, and based on the

13

parties' Rule 11 agreement, the trial court determined that "the total lodestar of reasonable and necessary fees that may be awarded in this case" was $308,522, with 75% or $231,391.50 attributed to Parameswaran's claim against the P.A. and 25% or $77,130.50 attributed to Parameswaran's claim against ASC.

On May 31, 2022, the trial court rendered judgment on the jury's verdict, implicitly denying Parameswaran's motion to disregard. The court awarded Parameswaran $299,031.38 as damages on his breach of contract claim against the P.A. That amount represents the difference between the sum of damages the jury awarded Parameswaran for years 2015, 2016, and 2017 and the amount the jury found he earned by working outside of the P.A. while employed by the P.A., which the court offset from the award of damages. The court awarded Parameswaran a total of $110,925.91 as damages on his breach of contract claim against the P.A. The court also awarded prejudgment interest on both claims, attorney's fees as determined in the court's post-verdict order, and conditional appellate attorney's fees.

On June 30, 2022, the P.A. filed a motion for judgment notwithstanding the verdict ("JNOV"), arguing there was no evidence of an agreement to pay Parameswaran in the manner he alleged at trial. ASC also filed a JNOV motion arguing that the evidence was legally and factually insufficient to find that Parameswaran was an employee of ASC and that ASC breached the loan

agreement. Both motions alternatively sought a new trial. The trial court denied the motion for new trial, and the P.A. and ASC appealed.

**Parameswaran's Motion to Reconsider Dismissal of Cross-Appeal**

On August 23, 2022, the P.A. and ASC filed a notice of appeal. On September 23, 2022, Parameswaran filed a notice of cross-appeal and a motion for extension of time to file his cross-appeal. We granted the P.A.'s and ASC's combined motion to dismiss the cross-appeal because we agreed that we lacked jurisdiction over the cross-appeal. Parameswaran filed a motion to reconsider that ruling, arguing that the Texas Rules of Appellate Procedure did not clearly establish when the time began running for a party to file a cross-appeal. We disagree.

Rule 26.1 provides that any party may file a notice of appeal within the applicable period or within 14 days after the first filed notice of appeal, whichever is later. TEX. R. APP. P. 26.1(d). Because the P.A. and ASC filed their notice of appeal on August 23, 2022, Parameswaran had 14 days from that date to file his notice of cross-appeal. Fourteen days from August 23, 2022, was September 6, 2022. Rule 26.3 permits the court to extend the deadline for filing of the notice of appeal if, within 15 days after the deadline for filing the notice of appeal, the party both files its notice of appeal and files a motion for extension. *See* TEX. R. APP. P. 26.1. Fifteen days from the deadline for Parameswaran to file his notice of cross-

15

appeal was September 21, 2022, but he did not file his notice of cross-appeal until September 23, 2022.

Because Parameswaran failed to file his notice appeal and motion for extension of time within the 15-day period after it was due, the notice and motion were untimely filed and we thus lack jurisdiction over the cross-appeal. *See Uni-Tec Trade, Inc. v. Schneider Elec. Servs.*, No. 01-19-00745-CV, 2020 WL 477218, at \*1 (Tex. App.—Houston [1st Dist.] Jan. 30, 2020, pet. denied); *Galerie Barbizon, Inc. v. Nat'l Asset Placement Corp.*, 16 S.W.3d 506, 508 (Tex. App.—Houston [1st Dist.] 2000, no pet.). We conclude that the deadline for Parameswaran to file his notice of cross-appeal began to run upon the filing of the notice of appeal on August 23, 2022. *See* TEX. R. APP. P. 26.1. We deny the motion to reconsider.

**Analysis**

In two issues, the appellants assert that the trial court erred by rendering judgment on the verdict. In the first issue, the P.A. argues that, under the unambiguous terms of the employment agreement, Parameswaran was not entitled to the compensation he sought. This issue combines a question about contract interpretation with an assertion of legal insufficiency. In the second issue, ASC argues that only a former employee is owed early repayment under the loan agreement, and Parameswaran was not an ASC employee under Texas law.

16

## I. We review de novo construction of a contract and whether it is ambiguous.

As to the first issue, the P.A. and Parameswaran advance conflicting interpretations of the employment agreement, but both assert that it is unambiguous. As to the second issue, ASC argues that the trial court erred by ruling that the loan agreement was ambiguous. ASC asserts that the loan agreement is unambiguous and that it is entitled to judgment as a matter of law. Whether a contract is ambiguous, and that contract's interpretation, are both questions of law that we review de novo. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

## II. We apply a legal sufficiency standard of review to a party's challenge to the denial of a JNOV.

We review a trial court's denial of a motion for JNOV the same way we review the denial of a motion for directed verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."). A directed verdict is proper only under limited circumstances, such as when there is no evidence of an essential element of a claim or defense, or when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See id.* "[W]hen a trial court's denial of a directed verdict is based on the evidence, the standard of review

is a legal sufficiency or 'no evidence' standard of review." *Austin Bridge & Rd., LP v. Suarez*, 556 S.W.3d 363, 376 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). We review the evidence in the light most favorable to the nonmovant. *City of Keller*, 168 S.W.3d at 824. If "there is any evidence of probative value to raise an issue of material fact on the question presented," the movant is not entitled to a directed verdict. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011). "On the other hand, to the extent that the trial court's ruling on a directed verdict is based on a question of law, an appellate court reviews that ruling de novo." *Austin Bridge & Rd.*, 556 S.W.3d at 376.

### III.   We employ principles of contract interpretation to determine if a contract is ambiguous.

"A contract is a written expression of the parties' intent. When that intent is in question, the text must be read 'as a whole in light of the circumstances present when the contract was entered.'" *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc.*, No. 22-0844, 2024 WL 2983170, at *1 (Tex. June 14, 2024). In construing a contract, our goal is to ascertain the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). This an objective determination. *See URI, Inc.*, 543 S.W.3d at 764. "[I]n interpreting a contract, we ascertain and give effect to the parties' intent expressed in the text, read without rendering any portion

meaningless, and not in the abstract but in the context in which the words appear and were written—the realities they were meant to address." *IDEXX Labs.*, 2024 WL 2983170, at *1.

To make this determination, we begin with "the contract's express language," and we "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners*, 341 S.W.3d at 333. We do not read any provision in isolation but consider each provision with reference to the whole. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We give undefined words their "plain, ordinary, and generally accepted meanings absent some indication of a different intent." *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015).

We must consider the contract's words in the context in which they are used. *IDEXX Labs.*, 2024 WL 2983170, at *4–5 ("Words aren't ambiguous merely because they can be read differently in the abstract. They must be read in context, another fundamental rule."); *see URI, Inc.*, 543 S.W.3d at 764. A court may consider the facts and circumstances surrounding the contract's formation as an aid in interpreting the contract's language, *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981), because the parol evidence rule does not bar consideration of "surrounding circumstances that inform, rather than vary from or contradict, the

19

contract text." *First Bank v. Brumitt*, 519 S.W.3d 95, 109–10 (Tex. 2017) (quoting *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)); *see, e.g.*, *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (holding that courts must view contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper.").

A court may not, however, consider "extrinsic evidence 'to create an ambiguity or to give the contract a meaning different from that which its language imports.'" *First Bank*, 519 S.W.3d 95, 109–10 (Tex. 2017) (quoting *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011) (internal quotation marks omitted) (quoting *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–51 (Tex. 2008))). Evidence of the parties' conduct after contract formation is extrinsic evidence that may not be considered when interpreting an unambiguous contract. *See Sun Oil*, 626 S.W.2d at 732 (considering evidence of parties' experience, bargaining position, and relative value of interest at stake when deciding contract was unambiguous and finding appellate court erred by considering subsequent conduct to interpret unambiguous contract).

"[O]nly when one [contractual] interpretation does not clearly emerge as correct after a full examination is a contract ambiguous and the determination of its meaning left to a jury." *IDEXX Labs.*, 22-0844, 2024 WL 2983170, at *6; *see*

20

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). If the contract's language can be given only one definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (citing *Italian Cowboy Partners*, 341 S.W.3d at 333). "[A] trial court errs when it submits an unambiguous contract to the jury rather than construing it as a matter of law." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019). "The error is harmless, however, if the jury found as the trial court should have found." *Id.*

**II.    The employment agreement is unambiguous and does not authorize the damages awarded in this case.**

In its brief, the P.A. argues that the evidence is legally insufficient to support the jury's verdict under a proper construction of the employment contract, and therefore the trial court erred by denying its motion for JNOV. The P.A. argues that it did not breach the employment agreement because the agreement required Parameswaran to be responsible for 25% of the P.A.'s expenses, it did not require inclusion of collections or expenses from ASC, and it did not limit Parameswaran's share of the expenses to 65% of his collections.

Parameswaran counters that his claims are for mandatory payments and based on the P.A.'s historical method of calculating his compensation. He also argues that the P.A.'s interpretation of the employment agreement's compensation

21

provision leads to absurd results, and that the employment agreement does not limit "collections" to only those from the P.A.

We agree with the P.A.

### A. Public policy in favor of freedom of contract requires us to construe the employment agreement as written.

"Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence." *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). "Freedom of contract is a policy of individual self-determination; individuals can control their destiny and structure their business interactions through agreements with other competent adults of equal bargaining power, absent violation of law or public policy." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481–82 (Tex. 2017) (internal citations omitted); *see Philadelphia Indem. Ins. Co.*, 490 S.W.3d at 475 ("As a general rule, parties in Texas may contract as they wish so long as the agreement reached does not violate positive law or offend public policy.").

When possible and otherwise proper, courts will avoid interpreting a contract that leads to an absurd, unreasonable, inequitable, or oppressive result, *see Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005), but "[a]bsent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." *See Philadelphia Indem. Ins. Co.*, 490 S.W.3d at 471. "Parties make their own contracts, and it is not within

22

the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures. . . ." *Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. 1942) (quoting *Dorroh–Kelly Mercantile Co. v. Orient Ins. Co.*, 104 Tex. 199, 135 S.W. 1165, 1167 (1911)); *see also Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). "The intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

## B.     The disputed provision is unambiguous.

The contractual language at the center of the parties' dispute appears in Attachment A, which was expressly incorporated into the employment agreement. There is no dispute concerning Parameswaran's compensation during the first 18 months of his contract. The dispute concerns payments to Parameswaran following those 18 months. Attachment A to the employment agreement includes a "base compensation" provision, that provides in relevant part:

> After the first 18 months, Physician shall be compensated in accordance with the Association's standard compensation model. Physician shall receive monthly the difference between his collections and his pro-rata share of expenses.  Expenses shall be divided evenly between each of the physicians in the [P.A.].

23

The disputed provision is comprised of three sentences. The first states a broad proposition that Parameswaran would be compensated in accordance with a "standard compensation model." "Standard compensation model" is not a defined term in the employment agreement, but the second sentence of the disputed provision expands on the nature of the standard compensation model. The second sentence provides that Parameswaran would receive monthly compensation calculated as the difference "between his collections and his pro-rata share of expenses." The last sentence provides that "expenses shall be divided evenly" between each of the physicians and the P.A.

There are only two parties to the employment agreement: Parameswaran and the P.A. The employment agreement describes and details the relationship and duties between those two parties. ASC is not a party to the employment agreement, and it is mentioned only in regard to the likely opportunity a person admitted as a shareholder to the P.A. may have to buy an interest in ASC. Nothing in the employment agreement indicates that "collections" for purposes of Parameswaran's compensation meant anything other than money collected by the P.A. for services rendered by Parameswaran or that expenses meant anything other than expenses of the P.A.

The term "pro rata" as it concerns the deduction of Parameswaran's "pro-rata share of expenses" from his collections is not a specifically defined term in the

24

employment agreement. We thus look to dictionary definitions to ascertain the common, ordinary meaning of the term. *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022). "Pro rata" means "proportionately according to an exactly calculable factor (such as share or liability)." MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/pro%20rata (last visited April 26, 2024); *see also* PRO RATA, Black's Law Dictionary (12th ed. 2024) (defining "pro rata" to mean "[p]roportionately; according to an exact rate, measure or interest").

The third sentence stating that "[e]xpenses shall be divided evenly between each of the physicians in the [P.A.]" refers to its immediate antecedent from the prior sentence, concerning "pro-rata share of expenses" and thus provides detail as to how the proportion of expenses will be determined: "Expenses shall be divided evenly between each of the physicians in the [P.A.]." "Evenly" is also an undefined term in the contract, but the context in which this word is used clarifies that it means that expenses would be divided proportionately according to the number of physicians in the P.A.

This interpretation is supported by consideration of the contract as a whole. The term "pro rata" appears in both paragraph 1 and paragraph 7 of Attachment A to the employment agreement. Paragraph 7 addresses the purchase price for buying

25

into the P.A., and it refers to the purchasing Physician's "pro-rata share of expenses (calculated as if he were an equal Shareholder)." This supports a conclusion that the parties intended to divide the expenses equally among the physicians in the P.A. As of late 2014, there were four physicians in the P.A.

Considering the language of the contract, we conclude that the compensation provision can be assigned a definite meaning: after his first 18 months in the P.A., Parameswaran would earn a monthly compensation equal to his collections for the P.A. minus one-fourth of the expenses of the P.A. (so long as there were four doctors working at the P.A.). Because the compensation provision is susceptible of only one definite meaning, we conclude that it is unambiguous. *See El Paso Field Servs., L.P.*, 389 S.W.3d at 806; *see also IDEXX Labs.*, 22-0844, 2024 WL 2983170, at *6 ("The interpreting court must decide whether the meaning of the text read in context is genuinely uncertain or whether one reasonable meaning clearly emerges.").

On appeal, as in the trial court, Parameswaran has argued in favor of an interpretation of the contract that comports with the method the P.A. used in the past to compensate him. But to adopt his interpretation requires us to consider evidence of communications about compensation that occurred after the formation of the contract, such as Masson's memo promising to cap expenses at 65%. This is

not evidence of an amendment to the contract; it is parol evidence that we are not permitted to consider in this context.

Finally, Parameswaran argues that a plain language construction of the employment agreement as advocated by Masson and analyzed by this Court would lead to an absurd result because his resulting compensation would be woefully low. But it is not within our province to vary the terms of the contract to protect a party from its consequences. *See Provident Fire Ins. Co.*, 162 S.W.2d at 687; *Tenneco Inc.*, 925 S.W.2d at 646. The contractual language itself is not such that no reasonable person would have agreed to it. Rather, implicit in the contract's structure is an aspiration or expectation that, after the initial 18-month period of salary, Parameswaran's collections would increase to an amount that would allow him to earn a profit after deduction of his share of expenses. The fact that Parameswaran's business did not grow as rapidly as he hoped and expected does not render the contract absurd. *See SAS Inst.*, 167 S.W.3d at 841.

We conclude that the contract was unambiguous and that under the express terms of the compensation provision, following his first 18 months in the P.A., Parameswaran would earn a monthly compensation equal to his collections for the P.A. minus one-fourth the expenses of the P.A.

**C.     The trial court erred by denying the JNOV motion.**

The trial court submitted the question of breach of contract to the jury. The evidence admitted at trial supports a finding that the P.A. breached the employment agreement only if the jury believed that the agreement required Parameswaran to be paid in accordance with his interpretation of the contract. We have explained why his interpretation is not in accordance with the meaning found within the four corners of the agreement. Accordingly, because we conclude that the contract was unambiguous, and the evidence established that the P.A. paid Parameswaran as required by the contract, there was no evidence to support the jury's finding that the P.A. breached the employment agreement.

We sustain the first issue, and we render take-nothing judgment in favor of the P.A. on Parameswaran's cause of action for breach of the employment agreement.

**III.   The loan agreement is unambiguous, and the trial court's submission of this issue to the jury was harmless.**

In the second issue, ASC argues that the loan agreement is unambiguous and urges this Court to render a take nothing judgment in its favor. Its argument revolves around interpretation of the contractual "terminated lender" repayment provision in the loan agreement. Relevant to our analysis, Section 3.4(a) of the loan agreement provides that

*Upon any Lender becoming a Terminated Lender*, Borrower shall pay to such a Terminated Lender, the greater of (i) twenty-five percent (25%) multiplied by the Appraised Value of the Real Property (provided, however, that if the accretion in value of the Real Property is determined to be interest then such payment due to the accretion in value shall be limited to the Maximum Rate), or (ii) the sum of the outstanding principal amount of, plus accrued interest on, such Terminated Lender's Term Loan

(Emphasis added). ASC argues that Parameswaran could not have been a "terminated lender" because that term refers only to lenders who had an employer-employee relationship with ASC, which Parameswaran did not. Parameswaran maintains that the Court must interpret the loan agreement based on the words used, and the loan agreement makes no mention of an employer-employee relationship. We agree with ASC that the loan agreement is unambiguous, but we disagree that the express and unambiguous terms of the agreement provide that a "terminated lender" be someone who had an employment-employee relationship with ASC.

The loan agreement was executed by Masson on behalf of ASC, the borrower, and the four doctors who worked at the P.A., as the lenders: Masson, Levaro, Parameswaran, and Shuhatovich. It is undisputed that none of the doctors had an employer-employee relationship with ASC when the loan agreement was signed, yet the loan agreement defined "Terminated Lender" as "any Lender that is *no longer* employed *in any capacity* by Borrower." Plaintiff's Ex. 21; *see First Bank*, 519 S.W.3d at 109–10 (explaining that court may consider surrounding

29

circumstances that inform rather than vary contract text). The words "no longer" and "in any capacity" suggest that that the lenders were "employed" in some capacity by ASC when the loan agreement was signed because if none of the lenders had been "employed" by ASC in any capacity when the loan was signed, this provision would be rendered meaningless. *See Italian Cowboy Partners*, 341 S.W.3d at 333 (noting that courts must consider express contractual language and harmonize all provisions so that none is rendered meaningless).

In the loan agreement, the word "employed" is a passive-voice verb in a dependent clause describing "lender." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (noting that courts construe contracts to "give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage"). Merriam-Webster includes two primary definitions of "employ" as a verb. The first definition of employ has three variants, defining employ as: (1) "to make use of (someone or something inactive)," for example, to "*employ* a pen for sketching," (2) "to use (something, such as time) advantageously," for example, "a job that *employed* her skills," or (3) (a) "to use or engage the services of" or (b) "to provide with a job that pays wages or a salary." MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/employed (last visited August 5, 2024). The second definition of the "employ" is "to devote to or direct toward a

30

particular activity or person," for example, "*employed* all her energies to help the poor." *Id.*

The contractual provision defining "terminated lender" thus makes clear that the borrower, ASC, is the party that would have "employed" the lender "in any capacity." Considering the need to harmonize all parts of loan agreement so that none are rendered meaningless, we conclude that, at the time of entering the contract, the parties mutually intended the words "no longer employed by" to be used in the general sense rather than to connote an employer-employee relationship. Thus, "no longer employed by" in the context of the loan agreement would mean that ASC was no longer making use of the lender or using the lender in any capacity.[2] It is undisputed that the lenders preferentially scheduled surgeries at ASC. In this context, ASC was used or "employed" the lenders to drive revenue to ASC as part of Masson's overall business model of operating the P.A. and ASC. *See IDEXX Labs.*, 2024 WL 2983170, at *4–5 (holding that courts must consider contract's words in context in which they are used).

ASC argues that the loan agreement's definition of terminated lender required that the lender must have been (at some point) an employee of ASC, and that ASC, as a matter of law, never had an employer-employee relationship with

---

[2] It is also undisputed that the lenders preferentially scheduled surgeries at ASC, thus driving revenue to ASC as part of Masson's overall business model of operating the P.A. and ASC.

31

Parameswaran. We disagree. The loan agreement does not state anywhere that a terminated lender is a person who is no longer *an employee* of the borrower; it states only that a terminated lender is a person "no longer employed in any capacity by the [b]orrower." The loan agreement does not mention an employer-employee relationship. As we have explained, the words used in the agreement itself do not support ASC's interpretation.

Our holding in this case is limited to the facts of this case, including the specific words used in this agreement, which can be assigned one definite meaning without resort to prohibited parol evidence. We therefore conclude that the loan agreement is unambiguous. To the extent that the trial court held that the loan agreement was ambiguous and submitted a fact question on its meaning to the jury, that was error. However, the jury found that the parties mutually intended that Parameswaran was "employed in any capacity" by ASC when the loan agreement was signed.[3] Because the jury's answer to that question is consistent with our interpretation, we hold that any error was harmless.

We overrule the second issue.

---

[3]     Jury Question No. 6 stated: "The following language is at issue: 'Terminated Lender' means any Lender that is no longer employed in any capacity by Borrower." Question No. 6 then asked: "Did the parties mutually intend that Parameswaran was employed in any capacity by ROC ASC, L.L.P. at the time of the Agreement?" The jury answered, "Yes."

## Conclusion

We reverse the trial court's judgment to the extent it awarded damages and attorney's fees to Parameswaran on his breach of contract claim against the P.A. We render judgment that Parameswaran take nothing on that claim, and we remand to the trial court for consideration of attorney's fees and costs and rendition of judgment. We affirm the trial court's judgment on Parameswaran's breach of contract claim against ASC. The motion to reconsider the dismissal of the cross-appeal is denied.


Peter Kelly
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.